IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GPS INDUSTRIES, INC., a Nevada corporation, and GPS IT, LLC, a Nevada limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> PROLINK SOLUTIONS, LLC, a Delaware limited liability company, PROLINK HOLDINGS CORP., a Delaware corporation, LINKSCORP, INC., a Delaware corporation, and ABC NATIONAL TELEVISION SALES, INC., a Delaware corporation <br><br> Defendants. | Civil Action No. FILED: JULY 16, 2008 <br> 08CV4028 <br> The Honorable  JUDGE KENDALL <br> MAGISTRATE JUDGE COX <br> Magistrate Judge _____ <br><br> **COMPLAINT**   PH <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs, GPS Industries, Inc. ("GPSI") and GPS IT, LLC ("GPSIT") (collectively "Plaintiffs"), complain against Defendants, ProLink Solutions, LLC ("ProLink Solutions"), ProLink Holdings Corp. ("ProLink Holdings") (collectively "ProLink Defendants"), LinksCorp, Inc. ("LinksCorp"), and ABC National Television Sales, Inc. ("ABC") as follows:

### THE PARTIES

1.      GPSI is a corporation incorporated under the laws of the State of Nevada with its principal place of business at 6554 176th Street, Unit 103, Surrey, British Columbia V3S 4G5, Canada.  GPSI manufactures and sells GPS based golf course distance measurement and course management products.

2.      GPSIT is a limited liability company incorporated under the laws of the State of Nevada with its principal place of business at 6554 176th Street, Unit 103, Surrey, British Columbia V3S 4G5, Canada.  GPSIT is a wholly owned subsidiary of GPSI.

3.      Upon information and belief, ProLink Solutions is a limited liability company incorporated under the laws of the State of Delaware with its principal place of business at 410 S. Benson Lane, Chandler, Arizona 85224.  ProLink Solutions competes with GPSI in the sale of GPS based golf course distance measurement and course management products.  ProLink Solutions conducts business in Illinois and in this District including, without limitation, extensive business dealings with several golf courses located in Illinois and in this District as further alleged in paragraphs 12 and 18 below.

4.      Upon information and belief, ProLink Holdings is a corporation incorporated under the laws of the State of Delaware with its principal place of business at 410 S. Benson Lane, Chandler, Arizona 85224.  Upon information and belief, ProLink Holdings is the sole owner of ProLink Solutions and conducts business in Illinois and in this District including, without limitation, extensive business dealings with several golf courses located in Illinois and in this District as further alleged in paragraphs 12 and 18 below.

5.      Upon information and belief, LinksCorp is a corporation incorporated under the laws of the State of Delaware with its principal place of business at 2801 Lakeside Drive, Suite 207, Bannockburn, Illinois  60015.  Upon information and belief, LinksCorp has in the past and continues to own, market and manage golf courses throughout the United States and conducts business in Illinois and in this District.

6.      Upon information and belief, ABC is a corporation incorporated under the laws of the State of Delaware with its principal place of business at 77 W. 66th Street, New York, NY 10023. Upon information and belief, ABC is a national media and marketing sales organization and conducts business in Illinois and in this District.

## JURISDICTION AND VENUE

7.    This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §271 *et seq*.  This is also an action for slander of title and unfair competition.  This Court has subject matter jurisdiction over the patent infringement counts pursuant to 28 U.S.C. §§1331 and 1338(a).  This Court has subject matter jurisdiction over the slander of title and unfair competition counts pursuant to 28 U.S.C. §§1338(b) and 1367(a).

8.    Venue is proper in this District pursuant to 28 U.S.C. §§1391(b), 1391(c) and 1400(b) because Defendants are subject to personal jurisdiction in this District, resides in, have regular and established places of business in, and/or have committed acts of infringement in this District.

## GENERAL ALLEGATIONS

9.    On November 11, 1997, U.S. Patent No. 5,685,786 ("the '786 patent") entitled, "PASSIVE GOLF INFORMATION SYSTEM AND METHOD" was duly and legally issued to Douglas P. Dudley on an application filed on May 24, 1995.  GPSIT currently owns the '786 patent. A copy of the '786 patent is appended as Exhibit A.

10.    On August 1, 1995, U.S. Patent No. 5,438,518 ("the '518 patent") entitled, "PLAYER POSITIONING AND DISTANCE FINDING SYSTEM" was duly and legally issued to Joseph A. Bianco, Curtis A. Vock, and John V. Bianco on an application filed on January 19, 1994.  GPSI currently owns the '518 patent.  A copy of the '518 patent is appended as Exhibit B.

## FIRST CAUSE OF ACTION – INFRINGEMENT OF '786 PATENT

11.    Plaintiffs hereby repeat and re-allege each of the allegations contained in paragraphs 1 to 10, as if fully set forth herein.

12.    The ProLink Defendants, by themselves, and through their subsidiaries, affiliates, and agents have been, and are, infringing the '786 patent by making, using, leasing, offering to sell, and/or selling devices incorporating the inventions patented in the '786 patent within the United

States and within this District; and by contributing to the infringement by others and by inducing others to infringe the '786 patent. Upon information and belief, Defendants' acts of infringement in Illinois include but are not limited to making, using, leasing, supporting, offering to sell, and/or selling infringing devices installed and used in the following golf courses in this District: Far Oaks Golf Club, Caseyville, IL; Highlands of Elgin, Elgin, IL; Fox Lake Country Club, Fox Lake, IL; The Glen Club, Glenview, IL; Poplar Creek, Hoffman Estates, IL; Whisper Creek, Huntley, IL; Marriott Crane's Landing, Lincolnshire, IL; Big Run, Lockport, IL; Steeple Chase Golf Club, Mundelein, IL; The Rail, Springfield, IL; Odyssey Country Club, Tinley Park, IL; RedTail Golf Club, Village of Lakewood, IL; Prairie Landing, West Chicago, IL; Chevy Chase, Wheeling, IL; and Water's Edge Golf Club, Worth, IL. Unless enjoined by the Court, the ProLink Defendants will continue to infringe, contribute to the infringement of and/or induce the infringement of the '786 patent.

13.     LinksCorp, by itself, and through its subsidiaries, affiliates, and agents has been, and is, infringing the '786 patent by making, using, leasing, offering to sell, and/or selling infringing devices supplied by the ProLink Defendants within the United States and within this District; and by inducing others to infringe the '786 patent. Unless enjoined by the Court, LinksCorp will continue to infringe and/or induce the infringement of the '786 patent.

14.     ABC, by itself, and through its subsidiaries, affiliates, and agents has been, and is, infringing the '786 patent by inducing others to directly infringe the '786 patent. ABC's acts of inducement include, without limitation, promoting infringing devices supplied by the ProLink Defendants, enabling and facilitating advertisers to provide advertising content for display on such devices and otherwise encouraging advertisers, golf course operators and others to implement and use such devices in ways that infringe one or more claims of the '786 patents within the United States and within this District. Unless enjoined by the Court, ABC will continue to induce the infringement of the '786 patent.

4

15.     Each Defendant's infringement and/or inducement to infringe the '786 patent has injured Plaintiffs, and Plaintiffs are entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. §284.

16.     Each of the Defendants' infringement and/or inducement to infringe the '786 patent has been willful and deliberate, and will continue to injure Plaintiffs unless the Court enters an injunction prohibiting further infringement of the '786 patent.

## SECOND CAUSE OF ACTION – INFRINGEMENT OF '518 PATENT

17.     GPSI hereby repeats and re-alleges each of the allegations contained in paragraphs 1 to 10, as if fully set forth herein.

18.     The ProLink Defendants, by themselves, and through their subsidiaries, affiliates, and agents have been, and are, infringing the '518 patent by making, using, leasing, offering to sell, and/or selling devices incorporating the inventions patented in the '518 patent within the United States and within this District; and by contributing to the infringement by others and by inducing others to infringe the '518 patent. Upon information and belief, Defendants' acts of infringement in Illinois include but are not limited to making, using, leasing, supporting, offering to sell, and/or selling infringing devices installed and used in the following golf courses in this District: Far Oaks Golf Club, Caseyville, IL; Highlands of Elgin, Elgin, IL; Fox Lake Country Club, Fox Lake, IL; The Glen Club, Glenview, IL; Poplar Creek, Hoffman Estates, IL; Whisper Creek, Huntley, IL; Marriott Crane's Landing, Lincolnshire, IL; Big Run, Lockport, IL; Steeple Chase Golf Club, Mundelein, IL; The Rail, Springfield, IL; Odyssey Country Club, Tinley Park, IL; RedTail Golf Club, Village of Lakewood, IL; Prairie Landing, West Chicago, IL; Chevy Chase, Wheeling, IL; and Water's Edge Golf Club, Worth, IL. Unless enjoined by the Court, the ProLink Defendants will continue to infringe and/or induce the infringement of the '518 patent.

19.    LinksCorp, by itself, and through its subsidiaries, affiliates, and agents has been, and is, infringing the '518 patent by making, using, leasing, supporting, offering to sell, and/or selling infringing devices supplied by the ProLink Defendants within the United States and within this District; and by inducing others to infringe the '518 patent.  Unless enjoined by the Court, LinksCorp will continue to infringe and/or induce the infringement of the '518 patent.

20.    The infringements by the ProLink Defendants and LinksCorp of the '518 patent have injured GPSI, and GPSI is entitled to recover damages adequate to compensate it for such infringement pursuant to 35 U.S.C. §284.

21.    Each of the ProLink Defendants' and LinksCorp's infringement of the '518 patent has been willful and deliberate, and will continue to injure GPSI unless the Court enters an injunction prohibiting further infringement of the '518 patent.

### THIRD CAUSE OF ACTION – SLANDER OF TITLE

22.    GPSI hereby repeats and re-alleges each of the allegations contained in paragraphs 1 to 10, as if fully set forth herein.

23.    On or about June 30, 2006, Defendant ProLink Solutions entered into an Intellectual Property Security Agreement with Comerica Bank of Phoenix, Arizona in relation to a Loan and Security Agreement by and among ProLink Solutions, ProLink Holdings and Comerica Bank.

24.    The Intellectual Property Security Agreement represented that ProLink Solutions owned an exclusive license in perpetuity under the '518 patent obtained from a third party ParView.

25.    The Intellectual Property Security Agreement purported to assign a security interest to Comerica Bank in ProLink Solutions' alleged license under the '518 patent.

26.    The ProLink Defendants knew or should have known that the Intellectual Property Security Agreement would be recorded by Comerica Bank against the chain of title of the '518

patent in the public records of the United States Patent and Trademark Office and thereby encumber GPSI's title to the '518 patent.

27.    The Intellectual Property Security Agreement was in fact so recorded by Comerica Bank.  A copy of the recorded Intellectual Property Security Agreement is attached as Exhibit C.

28.    On information and belief, ParView owned a limited license under the '518 patent prior to its eventual dissolution in bankruptcy.

29.    On information and belief, the ProLink Defendants claim to have obtained rights in the '518 patent from ParView in connection with an attempted merger with ParView and/or in connection with the subsequent acquisition by the ProLink Defendants of certain assets from the bankruptcy estate of ProLink.

30.    Neither of the ProLink Defendants obtained a valid license under the '518 patent from ParView or through purchase of assets from the ParView bankruptcy estate.

31.    Neither ProLink Solutions nor ProLink Holdings owns or has ever owned any valid license rights under the '518 patent.

32.    The representation of license rights under the '518 patent contained in the Intellectual Property Security Agreement with Comerica Bank is false and, on information and belief, was made by the ProLink Defendants with knowledge that the representation is false and that the ProLink Defendants did not and do not own a license under the '518 patent.

33.    On or about August 17, 2007, Defendants ProLink Solutions and ProLink Holdings entered into a further Intellectual Property Security Agreement with Calliope Capital Corporation.

34.    The August 17, 2007 Security Agreement represented that ProLink Solutions is the owner of the '518 patent and purported to assign a security interest in the '518 patent to Calliope Capital Corp.

35.    The ProLink Defendants knew or should have known that this additional Intellectual Property Security Agreement would be recorded by Calliope Capital Corp. against the chain of title of the '518 patent in the public records of the United States Patent and Trademark Office and thereby encumber GPSI's title to the '518 patent.

36.    The August 17, 2007 Security Agreement was in fact so recorded by Calliope Capital Corp.  A copy of the recorded August 17, 2007 Intellectual Property Security Agreement is attached as Exhibit D.

37.    Neither ProLink Solutions nor ProLink Holdings owns or has ever owned the '518 patent or any rights in the '518 patent.

38.    The representation made by the ProLink Defendants in the August 17, 2007 Intellectual Property Security Agreement that ProLink Solutions owns the '518 patent is false and, on information and belief, was made by the ProLink Defendants with knowledge that the representation is false and that the ProLink Defendants did not and do not own the '518 patent or any rights therein.

39.    Upon information and belief, the ProLink Defendants have continued to make false claims of license rights and/or ownership interests in the '518 patent to investors and to others within the golf industry, and have granted security interests in the '518 patent to others.

40.    By the above alleged acts, the ProLink Defendants have slandered GPSI's title to the '518 patent, and have injured and caused damages to GPSI.

41.    The ProLink Defendants will continue to injure and cause damages to GPSI unless the Court enters an injunction prohibiting the ProLink Defendants from making further false claims to rights under the '518 patent and from making further false assignments of rights in the '518 patent to others, and ordering the ProLink Defendants to take steps necessary to remove the encumbrances they caused to be placed on GPSI's title to the '518 patent.

8

## FOURTH CAUSE OF ACTION – UNFAIR COMPETITION

42.    GPSI hereby repeats and re-alleges each of the allegations contained in paragraphs 1 to 10 and 22-39, as if fully set forth herein.

43.    The ProLink Defendants' actions with respect to making false claims of rights and grants of security interests in the '518 patent constitute unfair competition and have injured and caused damages to GPSI.

44.    The ProLink Defendants will continue to injure and cause damages to GPSI unless the Court enters an injunction prohibiting the ProLink Defendants from making further false claims to rights under the '518 patent and from making further false assignments of rights in the '518 patent to others, and ordering the ProLink Defendants to take steps necessary to remove the encumbrances they caused to place on GPSI's title to the '518 patent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

1.    Judgment that the '786 patent is valid, enforceable, and infringed by the ProLink Defendants, LinksCorp and ABC;

2.    Judgment that the '518 patent is valid, enforceable, and infringed by the ProLink Defendants and LinksCorp;

3.    Judgment that each Defendants' acts of patent infringement are willful;

4.    A preliminary and permanent injunction enjoining each Defendant, its officers, agents, servants, employees and those persons acting in active concert or participation with each Defendant, from engaging in the aforesaid unlawful acts of patent infringement;

5.    An award of damages arising out of each Defendant's acts of patent infringement, together with interest;

6.     Judgment that the damages so adjudged be trebled in accordance with 35 U.S.C. §284;

7.     Judgment that the ProLink Defendants have slandered GPSI's title to the '518 patent;

8.     Judgment that the ProLink Defendants have engaged in unlawful acts of unfair competition;

9.     An award of damages arising out of the ProLink Defendants' acts of slander of title and unfair competition;

10.     A preliminary and permanent injunction enjoining the ProLink Defendants, their officers, agents, servants, employees and those persons acting in active concert or participation with the ProLink Defendants, from engaging in further acts of slander of title or unfair competition in relation to the '518 patent and ordering the ProLink Defendants to take steps necessary to remove the encumbrances wrongfully caused to be placed on GPSI's title to the '518 patent;

11.     An award of Plaintiffs' attorneys' fees, costs and expenses incurred in this action in accordance with 35 U.S.C. §285; and

12.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues triable of right by a jury.

Respectfully submitted,


Date:   July 16, 2008                      s/ Timothy P. Maloney
                                          Steven C. Schroer
                                          Timothy P. Maloney
                                          Ted S. P. Li
                                          FITCH, EVEN, TABIN & FLANNERY
                                          120 South LaSalle Street, Suite 1600
                                          Chicago, Illinois 60603
                                          Telephone: (312) 577-7000
                                          Facsimile: (312) 577-7007

                                          *Counsel for Plaintiffs*

```
08CV4028
JUDGE KENDALL
MAGISTRATE JUDGE COX


PH
```

# EXHIBIT A

US005685786A

# United States Patent [19]

## Dudley

[11] Patent Number: 5,685,786

[45] Date of Patent: Nov. 11, 1997

[54] **PASSIVE GOLF INFORMATION SYSTEM AND METHOD**

[75] Inventor: **Douglas P. Dudley**, West Bloomfield, Mich.

[73] Assignee: **Yardmark, Inc.**, W. Bloomfield, Mich.

[21] Appl. No.: **449,805**

[22] Filed: **May 24, 1995**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 240,983, May 11, 1994.

[51] Int. Cl.⁶ ........................... **A63B 57/00; A63B 67/02; G08G 9/00; G06F 15/28**

[52] U.S. Cl. ........................... **473/407;** 473/409; 473/131; 340/323 R

[58] Field of Search ...................................... 473/150, 169, 473/407, 409; 364/410, 444, 448–449, 458, 460; 340/323 R, 933, 988–991; 280/DIG. 5, DIG. 6; 180/167

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 3,786,411 | 1/1974 | Kurachi et al. . |
| 3,868,692 | 2/1975 | Woodward et al. . |
| 4,303,243 | 12/1981 | Wolfe . |
| 4,419,655 | 12/1983 | May . |
| 4,656,476 | 4/1987 | Tavtigian . |
| 4,698,781 | 10/1987 | Cockerell, Jr. . |
| 4,703,444 | 10/1987 | Storms, Jr. et al. . |
| 4,819,174 | 4/1989 | Furuno et al. . |
| 4,863,123 | 9/1989 | Bernard et al. . |
| 5,044,634 | 9/1991 | Dudley ................................... 473/407 |
| 5,056,106 | 10/1991 | Wang et al. . |
| 5,086,390 | 2/1992 | Matthews . |
| 5,319,548 | 6/1994 | Germain . |
| 5,324,028 | 6/1994 | Luna . |
| 5,326,095 | 7/1994 | Dudley ................................... 473/407 |

| | | |
|---|---|---|
| 5,364,093 | 11/1994 | Huston . |
| 5,434,789 | 7/1995 | Fraker et al. ........................... 473/407 |
| 5,469,175 | 11/1995 | Boman .................................... 473/407 |
| 5,507,485 | 4/1996 | Fisher ..................................... 473/407 |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| 3501033A | 7/1986 | Germany . |
| 2178210 | 2/1987 | United Kingdom . |

**OTHER PUBLICATIONS**

*How to Select GPS Receivers,* West Marine 1994 Master Catalog (pp. 6, 7, 8, 12, 19).

*Primary Examiner*—Jessica Harrison
*Assistant Examiner*—Mark A. Sager
*Attorney, Agent, or Firm*—Harness, Dickey & Pierce, PLC

[57] **ABSTRACT**

A golf information system and method which provides yardage and other information to a golfer relative to landmarks on a golf course operating in a "hands-free" or passive manner. In one embodiment, a differential global positioning satellite receiver (DGPS) is utilized to calculate a golf cart position and each time the cart stops, the detected position is compared with positions of landmarks mapped to zones on holes of the course. A location of each landmark is predetermined and stored in a look-up table, afterwhich the golf cart position is compared with the pre-stored positions to obtain a distance between the golf cart and each landmark. The calculated distance is subsequently outputted, preferably on a visual display where it is observed by a golfer. The system can also be used to send speed-of-play messages to a golfer from a clubhouse in order to speed up play, and can also be used to send emergency signals, and advertisements to the golfer. Information outputted to the golfer can be obtained from on-board memory, or in systems with communication features, the information can be sent from a golf course clubhouse or other remote location.

**12 Claims, 3 Drawing Sheets**





_Fig—1_

_Fig—2_



Fig—3



Fig—4



Fig—5



Fig—6

Fig—7

Fig—8

5,685,786

| 1 | 2 |

# PASSIVE GOLF INFORMATION SYSTEM AND METHOD

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation-in-part of co-pending application Ser. No. 08/240,983, filed May 11, 1994.

## BACKGROUND OF THE INVENTION

This invention relates to systems and methods for providing position and other information to a golfer playing a golf course and for further providing golfer play information to a golf course operator.

The game of golf has endured through the years as a test of man's subtle coordination. Powerful men must restrain their strength in favor of timing, touch, and strategy. Variations in a golfer's swing, body alignment, grip, and tempo combine with wind, weather, trees, hills, sand and water to make it virtually impossible to even once play a perfect game.

Professional golfers know the importance of eliminating as many variables from the game as possible in order to improve their scores. They use precision weighted clubs and new balls without scars or ovality. They practice their club swing for hours striving to create a consistent or "grooved" swing. When professional golfers reach a tournament course, they carefully study the tees, greens and hazards to plan their game strategy. One of the key aspects of strategy is knowing the distance or "yardage" from various points on the course to the green, and yardages to various hazards, such as water or sand traps. The yardage information enables the golfer to plan ball placement strategy and select the proper clubs for given distances. The amateur golfer is typically overwhelmed with the complexities of golf, and can rarely afford the luxury of inspecting the course and carefully planning golf strategy. The amateur cannot spend the time necessary to evaluate their ball positions accurately since play would become extremely slow and many courses do not have even the most rudimentary yardage references, such as the markers often used to designate a position 150 yards from the center of the green.

Various mechanized approaches toward determining the yardage to various points or hazards are presently known. Examples of such systems include optical range finders which are trained on a target such as the pin flag and calculate the exact distance through triangulation. Other approaches using radio frequency communication technology are also known for measuring distance to a target. However, typically such devices are "active" devices in that they require a golfer to take some special steps each time yardage information is needed which would slow down play, and would likely be viewed as unfair and awkward to other players. Moreover, such devices do not find distances to other significant course landmarks such as sand traps or water hazards, or features hidden from view. Therefore, an improved device is needed for obtaining positional signals indicating the golfers position which are compared with stored positions of landmarks on a course through calculation, yardage information is outputted to the golfer.

Additionally, the game of golf has evolved through the years from a game where players covered a course on foot while either carrying their clubs or towing their clubs on a hand held cart to a game where most players at least in the United States ride golf carts from shot to shot and hole to hole. As popularity of the game has increased and the number of players riding golf carts has likewise increased, the speed of play has dramatically decreased, particularly due to use of golf carts. However, the speed of play can still be increased. With each stop, a player must mount and demount from the cart which increases the time of play. Furthermore, players are typically paired together on a cart which means the cart must transit back and forth between both player's shots which greatly increases the distance an individual cart must travel. As a result, it has become necessary to monitor the position of golf carts on a course and furthermore to utilize employees, called "rangers", who scout a course for golf carts which are slowing down play in order to intercept them and encourage the players to accelerate their rate of play. However, use of rangers is expensive, inefficient, and disruptive. An employee can only monitor one position on a golf course at a time, and the presence of too many employees can produce an unwelcome golfing environment for most players. Furthermore, slow play on golf courses is generally caused by a handful of players who slow down play for the players following behind them. By monitoring the speed of play of all golf carts on a course, the information can be used to target slow golf carts in order to accelerate their play. As a result, a golf course can be more efficiently utilized which increases income on the course and makes play for all players more pleasurable and efficient.

Various approaches have been taken to monitor a position on a golf course, including radio frequency transmitters and receivers which function to perform radio location of a vehicle with respect to a plurality of transmitter antennas. Alternatively, location transmitters have been provided adjacent corresponding golf holes in a golf course which transmit a location signal to a golf-cart-based receiver in order to determine the length of time a golfer is taking to play a particular hole. However, such systems do not accurately determine position of a golf cart on a course while it is being played over its entire surface, and furthermore can not provide position and bearing information to a golfer in conjunction with speed of play information. Furthermore, improvements are needed for bi-directional exchange of such information between a golf cart and a clubhouse for interactively monitoring speed of play and transmitting warnings and messages between a player and a clubhouse, and additionally for detecting emergency conditions on a course. Additionally, previous attempts at monitoring golf cart position on a course have failed to accurately detect the golf cart's position relative to a hole being played, for example, when a ball is inaccurately played and it strays into another hole's playing area it causes confusion for the monitoring system when it can not distinguish which present hole is being played by a golfer.

Previously known golfer information systems typically require that the golfer actively request specific yardage and other information. Examples include the punching of a keypad to indicate the hole being played and the making of a specific golf yardage request to a particular target. Such approaches have the disadvantage that, as opposed to speeding the play of a golf game, they act as an interference and another activity which must be engaged in during the playing of a golf round. Moreover, the rules of tournament golf may not permit such "active" systems in that they may be perceived as providing a golfer with superior knowledge of such an interactive system an advantage not related to golfer skill. Since there is no specific request entered for the information in a passive system, any golfers playing the same hole and being located at the same positions is given identical information and thus all golfers enjoy the same advantages through use of the system. Accordingly, there is a need to provide a passive or "hands-free" golf information

5,685,786

**3**

system which provides and constantly updates information provided to a golfer during a round of golf.

Therefore, a need has arisen for a system which provides general golf information in a hands-free or passive manner and further provides positional and locational information to a golfer on a course and which would improve speed of play. An ideal system would further provide monitoring and signaling between a golf cart and a golf clubhouse which automatically monitors a golfer's speed of play and notifies the golf course personnel and golfer of slow play, while further being capable of providing for additional information of interest to a golfer.

Further objects, features and advantages of the invention will become apparent from a consideration of the following description and the appended claims when taken in connection with the accompanying drawings.

## SUMMARY OF THE INVENTION

The systems and methods according to the present invention provide the desirable features discussed previously. In accordance with this invention a golf cart or handheld information unit that moves with the golfer first receives one or more signals which are processed to designate its location. One example of a means of establishing its location is through the use of a global positioning satellite (GPS) system. Through the use of recent advances in GPS technology, the GPS satellite location signal is supplemented with a ground base radio navigation differential beacon which greatly enhances the accuracy with which a position can be fixed. Once the golfer information system receives a position signal it compares its present location with significant landmark position data stored in memory and calculates a difference in position to generate a distance value. Various types of golfer information can be provided using this approach. For example, a distance to a green or cup can be displayed with accuracy. Similarly, distance to water hazards or sand traps can also be displayed. Since many golfers desire to know the distance of their drive, this information can also be displayed. In addition to yardage and position information, other information of significance to a golfer can be generated. For example, local weather information can be displayed. Advertiser's can also make use of the system to enable information about products or services to be displayed to the golfer. Additional information of relevance can include a golfer's personal club selection criteria so that a particular club can be displayed associated with a particular yardage range. Warnings regarding dangerous conditions such as crossroads, cliffs, protected plant species, or sensitive course areas can also be displayed.

The golfer information system according to this invention can also include an internal dock so that time related information can be displayed. The time signal may also be generated from a GPS signal. This time information can be used to display target time to play against actual progress and displayed to a golfer and/or management staff information regarding speed of play.

A significant feature of the golfer information according to this invention is its "hands-free" operation. In order for the system to be truly "passive" a number of operational features are provided. For example, the system must be able to discriminate which hole is being played so that it will provide the appropriate landmark information and make calculations as to yardage. It is a well known tendency of many golfers to play a hole in an untraditional manner, sometimes hitting the ball from adjacent hole fairways, etc. In order for the system to avoid confusion by such play,

**4**

various features are provided. The system can be triggered to make a distance calculation on some que such as the stopping of a golf cart. An input indicating such stoppage can come from a movement detector on the vehicle such as a rotary shaft encoder on a drive wheel or another drive train component. Alternatively, if the system receives satellite data indicating that it has not moved in a preselected time an assumption can be made that the unit has stopped. Upon stoppage, the appropriate yardage information is calculated and output.

The golf tee boxes of holes can be described as falling within certain coordinate boundaries. Upon the stoppage of a golf cart the system of this invention could determine if it falls within one of these boundaries. If so, the system identifies the hole being played and all yardage information calculated is related to that hole until it reaches a next hole tee which re-initializes the system for that hole. This system would accordingly allow holes to be played in a nonconsecutive manner. The system of this invention also allows the information provided to the golfer to change depending on their position on a particular golf hole. For example, the distance from the tee which indicates a drive distance is only significant in an area of a typical first shot landing. Thereafter, this information is meaningless. Similarly, hazards such as sandtraps may only be significant once the golfer approaches the green or is at some other area. Moreover, the golfer is generally unconcerned with hazards which are farther from the green than their present location. Thus, the system incorporates assumptions and operational features which allows pertinent information to be displayed without interaction with the golfer. As one means of providing pertinent information, a single golf hole can be divided into a number of zones defined by area boundaries. The system includes features for associating particular landmarks of interest with various zones. The boundaries of certain zones may also be based on a calculation from present position to center of the green with various distance ranges being associated with different zones. Thus, in this manner, zones need not necessarily be defined as area boundaries but rather ranges of distance from a landmark.

In addition to providing valuable information to the golfer, the system of this invention also includes features for enabling information to be transmitted to a central station such as a clubhouse where golf course operators can monitor play. The system can provide periodic information on the location of all golf carts on the golf course. This would enable convenient monitoring of speed of play and relative positioning of players on a hole. It would also provide a warning of golf carts being in forbidden areas. This system could also permit the golfer's to know where adjacent golf carts are located. For example, in some golf courses it is very difficult for a golfer on a tee or other location on a fairway to know if the golfer's in front of them are out of danger from their next shot. The transmitting capability of the golfer information system would also allow other maintenance information such as electric cart battery voltage or a condition where a golf cart remains in one position for an excessive period of time indicating a possible mechanical breakdown requiting attention. The golf course operator would also be able to monitor any incidences of a golf cart being in a forbidden area, such as too close to a green or other restricted areas. Information received by the central station could be relayed to a ranger who is roving on the course to enable them to pinpoint problem situations.

In addition to these features additional provisions for the system of this invention can include integration of the golfer information system with a course irrigation system so that

5,685,786

5

irrigation is terminated when a golfer is in a particular area but is activated when it will not interfere with golf play. All the information available to the golfer and local course operator can also be communicated through remote link-up many miles away to allow monitoring of tournaments, coordinating television coverage, etc. Communication with the central station could also include a manual interface in which a golfer could send a signal such as a distress signal to the course operator.

Further objects, features and advantages of the invention will become apparent from a consideration of the following description and the appended claims when taken in connection with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plan view of an illustrative golf course hole incorporating elements of the golf information system according to a first embodiment of this invention;

FIG. 2 is a schematic diagram of a golf cart incorporating elements of the golf information system in accordance with the first embodiment of this invention and showing a global positioning satellite receiver and a differential beacon receiver in relation to the golf cart;

FIG. 3 is an electrical schematic diagram showing the functional subsystems of the global positioning satellite receiver and differential beacon receiver used with the golf cart information system of the first embodiment of this invention, and carried by a golf cart;

FIG. 4 is a block diagram of a radio frequency transmitter/ receiver unit used upon the golf cart of the preferred embodiment of this invention for communicating with a clubhouse;

FIG. 5 is a block diagram of a radio frequency transmitter/ receiver unit provided in a clubhouse for communicating with a golf cart;

FIG. 6 is an electrical schematic diagram of the status board and zone landmark look-up tables found generally in FIG. 2;

FIG. 7 is an electrical schematic diagram of the functional subsystems of the status board shown generally in FIGS. 2 and 3; and

FIG. 8 presents an illustrative output of information for the golfer provided by the first embodiment of the system of FIG. 2.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to FIG. 1, a representative golf course hole generally designated by reference numeral 10 is shown with a pair of tee areas 12 and 13, creek 14, and a green 16 having a cup 18 which supports a flag or pin 20. A designated golf cart path 22 is provided on the left-hand side of a fairway 24 on which a golf cart preferably travels while a golfer plays a round of golf. A clubhouse 26 is further provided with a transmitting and receiving antenna which is connected with a radio frequency receiver unit 30 and a radio frequency transmitter unit 32. Furthermore, a high altitude satellite 34 is also shown in FIG. 1, which is in geosynchronous earth orbit, wherein a global positioning satellite receiver receives signals from a number of such satellites to determine its location on the earth. Likewise, a radio frequency transmitting antenna 36, preferably a land-sea radio navigation antenna as run by the Coast Guard branch of the United States Government, is shown for transmitting signals to a radio navigation receiver, in this case a differential beacon

6

receiver, in order to calculate positional error produced by a global positioning satellite receiver in order to obtain extremely accurate error correction which leads to accurate position from the DGPS system. An end-of-play region 38 is provided around a portion of the golf cart path 22 adjacent flag 20 such that presence of the golf cart within the region is used to determine end of play for a golf course hole which enhances a golf information system's ability to detect the presence of a particular golf cart within the golf course hole presently being played, even when play leads the golf cart into an adjacent hole as a result of a poorly played ball.

Each hole on the golf course is subdivided into regions, or zones via a zone look-up table. For example, hole 10 is subdivided into zones Z1–Z3. Key features, or landmarks of interest when playing from within each of these zones are then assigned, or mapped into each respective zone via individual landmark look-up tables. Typical landmarks are shown as a bunker T6, a stream T8 crossing a fairway, a position to clear the stream T9, center of green T12, and position of cup T14. As depicted in FIG. 1, zone Z1 is defined by a pair of circular regions C1 and C2 formed about a center-of-green (COG) of green 16. The center-of-green is depicted as landmark T12. Zone Z2 is defined by a pair of circular regions C2 and C3 formed about the COG of green 16. Finally, zone Z3 is defined by a single circular region C3 about the COG of green 16. Alternatively, various mapped geometries could be assigned to each region by providing a defined map region in memory, or integrally within a digital course map 86.

Preferably, the zones Z1–Z3 are strategically laid out on a hole 10 so as to encompass strategic locations on the hole suitable for conveying appropriate landmark information contained therein. For example, zone Z1 is laid out to include the region into which a golf ball is most likely to land when originally hit from the tee location 12. Therefore, one of the pieces of information assigned to a look-up table for zone Z1 would be "distance from the tee". Similarly, zone Z2 is laid out to include landmarks T8–T10 that are most likely encountered when playing a golf ball located within zone Z1. Finally, zone Z3 is laid out so as to convey information for landmarks T11–T14 consisting of hazards and green information located approximate the cup and green.

Preferably, all landmarks T1–T14 located within zones Z1, Z2, and Z3 are assigned to zone Z1. Likewise, all landmarks T6–T14 located within zones Z2 and Z3 are assigned to zone Z2. Furthermore, all landmarks T8–T14 located within zone Z3 are assigned to zone Z3. Additionally, the COG (T12) and cup position T14 are both assigned to all zones of hole 10. Preferably, the landmark assignments for each zone Z1–Z3 are implemented in a landmark look-up table 88 for each zone, stored in memory in EEPROM 98 and/or RAMS 100 and 102. For example, a look-up-table for landmarks assigned to hole 10, zone Z1 will list each landmark, or target T1–T14 along with an assigned x and y coordinate value locating the landmark with respect to the tee 12 on hole 10. As an example, the following landmark look-up-table lists target coordinates for landmarks assigned to zone Z1:

| Landmark (Target) No. | X Coord. | Y Coord. |
|---|---|---|
| T1 | 112 | 541 |
| T2 | 125 | 560 |
| . | . | . |

5,685,786

7

-continued

| Landmark (Target) No. | X Coord. | Y Coord. |
|---|---|---|
| . | . | . |
| . | . | . |
| . | . | . |
| T8 | 245 | 642 |
| T9 | 248 | 650 |
| T10 | 250 | 780 |
| T11 | 261 | 764 |
| T12 | 265 | 800 |
| T13 | 272 | 805 |
| T14 | 266 | 798 |

By subdividing each hole into zones and assigning landmarks of interest to a golfer playing from that zone, DGPS system 42 can passively calculate and display important landmarks T1–T14 and their distances from the present location of the golf ball on the hole 10. Each time the golf cart 40 stops on the hole, the DGPS system 42 is triggered to calculate the cart position (which is preferably adjacent the golf ball in play), determine the zone the cart is in via the zone look-up-table, and pull from the landmark look-up-tables the landmarks of interest for that particular zone along with their previously measured locations on the hole. Subsequently, the position of the cart is compared and calculated to each landmark position, and the distance to each landmark from the cart is visually displayed to the golfer on a display 104.

Preferably, additional information in the form of messages and advertisements can be displayed to the golfer. A typical message might screen-display the following header message, "Par 4 Hole 1 Hdcp 12" followed by tee ID, "Yardages are measured from WHITE buried marker" followed by target info for T6, "To bunker on right 156" T7, "To carry bunker 170" T8 "To stream crossing fairway 260" T9 "To carry stream 271" T12 "Overall length of hole 410" and possibly "USGA target time to play this hole is 14 min.". Alternatively, some or all of the information could be verbally broadcast to the golfer via a speaker and voice generation software resident in status board 52 as shown in FIG. 2.

A description of the physical components and electronic systems of a golf information system according to the first embodiment of this invention will be made with reference to FIGS. 2–6. A description of the operation of the system will be provided following this physical description of the elements. FIG. 2 shows a golf cart 40 that carries a differential global positioning system (DGPS) receiver 42 for detecting golf cart position on a course. DGPS receiver 42 principally comprises a GPS receiver 44 and a differential beacon receiver 46 which are interconnected such that GPS receiver 44 receives a satellite fix from a satellite and differential beacon receiver 46 receives radio and navigation signals to determine position relative to at least one transmitting antenna such that the differential error for the GPS receiver is calculated and corrected for in order to provide increased fix accuracy of a golf cart's position on a course. Both a GPS receiver 44 and compatible coupling differential beacon receiver 46 are commercially readily available which communicate together to perform enhanced fix accuracy as a DGPS receiver 42. Such systems are presently available from GARMIN INTERNATIONAL INC., located at 9875 Widmer Road, Lenexa Kans.

As shown in FIG. 4, a differential GPS system is incorporated in the antenna system on the golf cart 40. Alternatively, where the United States Government has waived the intentional degradation of non-military GPS signal accuracy on behalf of the Department of Defense,

8

thus eliminating selective availability, differential GPS is no longer needed, and a standard GPS receiver 44 would provide the requisite necessary additional information of a golf cart accurately positioned on a golf course.

With reference to FIG. 2, a golf cart 40 is provided with the DGPS receiver 42 in order to determine a golf cart's position. An antenna assembly 48 interconnects with the DGPS receiver 42 through a status board 52 which receives and stores additional information from the DGPS receiver 42, and furthermore provides display information to a computer and display board 54. A battery 56 drives the entire system electronics through the status board 52. Additionally, a wheel motion sensor 51 detects motion of the golf cart 40 on a course in order to detect when the cart stops so as to trigger the DGPS system to calculate a new position on the course, and passively display calculated distance information and messages to a golfer relating to a presently occupied hole and zone.

FIG. 3 further depicts the various elements of the golf cart information system 9. DGPS receiver 42 records positional information of the golf cart 40 which is input into status board 52. The calculated position of the cart can also be compared with known course position information stored on a digital course map 86 (optional) which is digitally stored to determine the status of a golf cart on a course. Preferably, this information is relayed to the clubhouse 26 via a communication system. Furthermore, the calculated position, along with any messages or updates received from the clubhouse, are fed to the computer and the display board 54 via the communication system such that position and status information, as well as messages and prompt signals, can be detected by a golfer on the cart. Preferably, a radio frequency transmitter/receiver unit 58 provides the communication system for interactive monitoring of a golf cart's position on a course by personnel at clubhouse 26 through the transmitting and receiving antenna 28.

Referring now to FIG. 4, there is shown details of the radio frequency transmitter/receiver unit 58 used in the preferred embodiment of this invention and containing the antenna 48 provided on the golf cart 40, a radio frequency transmitter and receiver 60, a key demodulator 62, and a micro-processor 64 (shown generally in FIG. 6 described below). Antenna 48 is coupled to the radio frequency transmitter/receiver 60 by bus 66 while the radio frequency transmitter/receiver 60 is coupled to the key demodulator 62 by bus 68. The output of the key demodulator 62 is coupled to the micro-processor 64 by bus 70.

In operation, signals are output from antenna 28 at the clubhouse 26 which are received by antenna 48 and then input to the radio frequency transmitter and receiver 60 by signals on bus 66. Thereafter, the received radio frequency signals are input into the key demodulator 62 by bus 68, where the received signal is demodulated thereby producing the original stream of data originally transmitted from the radio frequency transmitting unit 32 within the clubhouse 26. Demodulator 62 then impresses this data upon the bus 70 to the micro-processor 64. Micro-processor 64 then functions in conjunction with a micro-controller 72 and entities 82, 84, 98, 100, and 102, shown in FIGS. 6 and 7 in the aforementioned manner to receive and interpret the digital signal data originally received from the clubhouse antenna 28.

Referring now to FIG. 5, there is shown a golf cart 40 in conjunction with a typical golf course clubhouse 26, in which a radio frequency transmitter/receiver unit 76 and a typical display (e.g., cathode ray tube, liquid crystal display,

5,685,786

9

etc.) 78 are housed. Specifically, radio frequency transmitter/receiver 76 is coupled to antenna 28 by an antenna coupler 74 and is further coupled to display 78 by bus 80. In operation, the digital signature upon bus 49 which is stored on status board 52 as received from DGPS 44 and compared with landmark position data on look-up-tables 88 is sent by antenna 48 of golf cart 40 to antenna 28 which couples to receiver 32 within transmitter and receiver unit 76 which then places it upon bus 80 to the display 78. The receiver 32 would normally contain a key demodulator 62 as shown in FIG. 4 in order to reproduce this signature data from the radio frequency data. In this embodiment, the digital signature generator generates a golf cart signature in addition to the aforementioned distance signature upon status board 52 from DGPS 42 as well as current time data. Display 78 then visually displays the golf cart position information for golf cart 40 and the calculated distances to landmarks T1–T14. Detection of the cart within the regions 38, 39 and 41 indicates the hole presently being played by golfers on the cart in conjunction with the DGPS 42. In this way, the management of the typical golf course can determine where each of a plurality of golf carts 40 are located at any given time on the golf course and can, by observing the display 78 over a period of time, determine the approximate speed of play associated with users of golf cart 40. This could be used to potentially speed up the overall play upon a typical golf course. Furthermore, messages may also be transmitted to the golf cart 40 on a golf cart liquid crystal display 104 by micro-controller 72 if too much time has elapsed during play of a single golf hole 10. Furthermore, information can be transmitted to the display 104 indicating warnings or hazardous weather conditions, for example, lightning or tornados, as well as advertising, and requests for the user to transmit acknowledgement of receipt of such a message.

Additionally, wheel sensor 51 detects rotation and non-rotation of a golf cart wheel in response to motion and stopping conditions. When the sensor detects a stopping condition, software resident on status board 52 directs the DGPS 42 to calculate cart position on the course. Preferably, when sensor 51 detects cart motion, time information is displayed on display 104, along with any messages or advertisements. Each time the cart stops, a signal from sensor 51 directs a calculation of cart position, afterwhich the landmark look-up table associated with the zone is retrieved and the distance to each respective landmark referenced in the zone look-up-table is calculated and displayed.

The status board 52 and course topographical information 50 are shown in detail in FIG. 6 and include micro-processor 64 having its operating system software stored on EEPROM 82 and RAM 84. Course topographical information 50 consists of a digital course map 86 and all of the previously mentioned look-up tables 88. The look-up tables include look-up tables for each of zones Z1–Z3, as well as look-up tables relating to detection of presence on a particular hole on the course; namely, tables that detect entrance onto a particular hole via regions 39 and 41, as well as exit via region 38. Micro-processor 64 monitors and receives position information from DGPS 42. A voltage regulator 106 receives power from golf cart battery 56 and provides a filtered and controlled power supply for reading position information from the DGPS 42. As shown in FIG. 5, a number of data input and output signal lines are provided for micro-processor 64, including present hole signal 90 and position signal 92 which are outputted from micro-processor

10

64, and receive data signal 94 and reset signal 96 which are inputs. Operation of the DGPS 42 in response to signals from lines 90–96 will be described in greater detail below.

The functional components and subsystems of the computer and display board 54 are shown with reference to FIG. 7. Micro-controller 72 has its operating system stored on EEPROM 98 and several RAM chips 100 and 102 are provided for data storage. A real time clock 108 provides a time-of-day reference and can be used for displaying a local time message to the golfer and/or timing the golfer's progress through the course. The power supply for computer and display board 54 is the golf cart battery 56 and also includes a voltage regulator 110. Lithium battery 112 and battery backup control 114 are provided to retain stored information upon interruption of power from golf cart battery 56. Micro-controller 72 drives display 104 which is preferably a liquid crystal-type since they are easily read in bright sunlight. The position transmit and receive signals 92 and 94 are inputted into micro-controller 72, and reset signal 96 is outputted. The present hole signal 90 is provided for a ranger of a clubhouse to determine the present hole being played by golfers on a specific identified golf cart.

Normally, signal 90 is operable to receive update signals which modify the parameters defining the start and end-of-play regions for a particular hole 10. A tee check region 39 or 41 indicates start-of-play on hole 10, either from tee 12 or 13, respectively, as the DGPS enters the region along cart path 22 and stops. Similarly, an end of play region 38 indicates end-of-play for hole 10 as the cart enters the region about green 16 and stops. A change in status of the present hole being played by a golfer on cart 40 can be tracked by detection of the cart within the tee check and end-of-play regions for each hole on the course. Preferably, each region is a circle having a defined radius, which is identified by a specific position point on the course stored in memory in an initial tee-check look-up-table 88 such that it is compared by micro-processor 64 with a DGPS position point for the cart 40. For example, region 38 can be provided about a hole 10 such that positioning of a cart adjacent a hole indicates end of play of that hole and the system is notified once the cart leaves the region to update the hole status incrementally to the next numerical hole number such that the present hole signal 90 is incrementally increased by unit one. Alternatively or additionally, a tee-check region 39 or 41 can be provided about a tee area 12 or 13, respectively, such that position of the cart adjacent the tee can be used to trigger start of a new hole, and once detected, the number of a hole being played can be "reset".

In one mode of operation, received data signal 94 is provided to receive updated landmark and course change information as contained within digital course map 86 and/or look-up tables 88. Normally, signal 94 is in an activated and ready state and only sends a signal to micro-processor 64 when a cup position on a course, or a desired landmark position has been changed by a course grounds keeper. The transmitted present cup signal 90 consists of the coded signal outputted from the DGPS 42 which has been processed and reformatted by a micro-processor 64.

Operation of the golf information system according to the first embodiment of this invention will now be described in view of the above description. Since the high altitude satellite 34 and radio frequency transmitting antenna 36 are continuously operating, an accurate position of cart 40 is outputted to status board 52 as further detailed in FIG. 6. Preferably, due to the implementation of Selective Ability (SA) which degrades the accuracy of the satellite signal, DGPS 42 must be implemented in order to accurately obtain

5,685,786

11 12

the cart's position. Alternatively, in the event selective availability is not implemented on the global positioning satellite signal, a standard GPS unit 44 can be utilized alone to obtain an accurate position of the golf cart 40 on a golf course. Furthermore, ordinary GPS can be implemented which will provide less accurate positional information. Micro-processor 64 receives such accurate position information continuously updating such information so as to calculate the distance to landmarks retrieved from the look-up tables 88, or to compare it with a digital course map 86 in conjunction with information on the course hole presently being played as detected by the DGPS 42 in order to provide information both to the golf cart operator via display 54, namely, liquid crystal display 104, as well as by a golf cart operator via receiving unit 30 in a clubhouse 26 on a clubhouse display 78. The software on the status board 52 compares the position information from the DGPS 42, or GPS (44), with the digital course map information in order to provide a golf cart position with respect to a particular hole, namely, in relation to a green and hole, or a tee area 12. Such information provides relative positional information of the golf cart with respect to the golf course. Alternatively, global position of a golf cart with respect to the earth can be compared to positional information of the golf course in determining position of a golf cart on a golf course. Furthermore, speed of a golf cart on a golf course can be monitored and detected by differentially measuring and comparing the position information from the DGPS 42 over time, or alternatively, by monitoring velocity information output from a DGPS 42 which displays golf cart speed.

The signal outputted by the DGPS 42 is processed at micro-processor 66 and transmitted to micro-controller 72 which fetches a set of instructions from a look-up table contained in processor EEPROM 98 and/or RAM's 100 and 102. The signal from micro-processor 64 on line 92 is sent to micro-controller 72 in serial fashion, for example, as a twelve-bit word at 1,200 baud. Signals having larger binary digits, or words, could be used to discriminate larger chunks of data received from the DGPS.

FIG. 8 illustrates a representative hands-free output generated by a clubhouse transmitted message which informs a golf cart operator of a slow play condition, as well as displays present time, and position on a course when present in zone 23, as well as present hole being played. Furthermore, distance to the pin is also displayed in a manner which could be utilized to further provide positional information of a golf cart on a course to a golfer. Likewise, time and time remaining to play can be displayed when motion sensor 51 detects movement of the cart between locations on the course. An emergency prompt button 116 is also provided adjacent the liquid crystal display 104 in the computer and display board 54 which allows a golfer to signal an emergency on the course to a golf course employee in clubhouse 26. For example, a medical emergency requiring immediate action could be signaled by depressing the emergency button where an operator in the clubhouse can detect the golf cart's present position and can dispatch a course ranger immediately to respond to such emergency. Furthermore, a transmit button 118, or alternatively, a dual use of button 116, can be used to signal an acknowledgement of a message received from a clubhouse by a golfer on the golf cart 40. For example, upon transmission of a message to speed up play, a golfer can acknowledge receipt by depressing the transmit button 118. Furthermore, a microphone 120 and speaker 122 are further provided on the display board 54 for carrying out a conversation between the clubhouse and golf cart.

By using a digital course map 86 in conjunction with the DGPS position information to track motion of a cart on the course, the size of memory necessary for a ranger to monitor a golf cart's position is minimized, and the reliability and speed of information transmission between the golf cart and clubhouse is enhanced, and modifications to the outputted information can be easily achieved by reprogramming out the digital course map 86, or else by using the landmark positions or regions resident in look-up tables 88. Digital course map systems, or cartographic map systems, are presently available for marine use from GARMIN INTER-NATIONAL INC., located at 9875 Widmer Road, Lenexa, Kans. An example is the GPSMAP 220 by GARMIN which utilizes a GPS receiver with cartographic digitized maps, or charts, from Navionics located at 8 Pine Meadow Pl., Commack, N.Y. Alteratively, either the digital course map 86 and/or the landmark look-up tables 88 can be provided in the clubhouse such that precise positional information is transmitted from the golf cart through antenna 48 to the clubhouse antenna 28 where the information is compared with the digital course map information and landmarks to determine a golf carts position on the course, as well as a golf carts relative position to known landmarks or features on the course which further allows for protection of the present hole being played by a golfer on the cart.

In addition to the above features, the golf information system according to this first embodiment also provides the capability of several additional functions and features. In conjunction with the real time clock 108 as well as the landmark look-up tables 88, micro-controller 72 can measure the elapsed time a golf cart has spent on a particular hole or has spent throughout a golf course such that the time of play for a particular hole or a segment of the course can be monitored. If the measured play is excessively slow, a prompting message can be automatically displayed to a golfer on display board 54 which may be further supplemented by an audible signal from an emitter, here speaker 122. The look-up table contained in EEPROM 98 and RAM's 100 and 102 for micro-controller 72 can also include advertising messages which are activated by an operator or system in the clubhouse. The system can also contain a number of housekeeping functions. For example, an internal count can be made of the number of reading cycles by a particular golf cart to evaluate cart usage and a low battery signal could be outputted from the cart which alerts the operator of the necessity of maintaining the cart. Likewise, the number of warning signals displayed to a golf cart operator can be monitored both by the golf cart operator on display board 54 and display 78 in the clubhouse.

Another refinement for the subject golf information system, of this first embodiment, comprehends changes in repositioning a cup 18 on the surface of a green 16 which has the effect of changing the distance from the reference points provided in the digital course map 86. As shown in FIG. 1, a starting location for a given hole can be designated with the landmark x,y coordinate found in the look-up tables 88, the end-of-play region 38 as well as, or alternatively by, the tee check regions 39 or 41. Preferably, both regions are positioned adjacent the tee area 12 and green 16, or hole 10, in the location where a golf cart 40 will pass as a player begins or ends play on a particular hole. For example, the size of the region surrounding a definitive location or region on the course is preprogrammed and determined based upon course and hole shape, size and ground surface area provided for a golf course to pass over. Furthermore, zones Z1–Z3 are actually regions defined by circles formed about COG, each having a different radius. Such information is

5,685,786

13

stored in EEPROM in the look-up tables 88 adjacent EEPROM stored information for digital course map 86. When the golf cart 40 is detected through DGPS 42 in response to motion sensor to be within such a region, knowledge about the location of the cart with respect to a hole is made available. For example, when a golf cart is detected in the tee check 39 or 41 via matching with a tee check look-up-table, it is known that the golf cart is beginning play on that particular hole. Likewise, as a golf cart enters the end-of-play region 38, it is known that the golf cart is completing play on that hole and about to begin play on the next, or subsequent hole. Preferably, the digital course map 86 can be updated from an operator within the clubhouse through transmitting unit 32 and data landmark signal 94 with reset signal 96. In the case where a cup is moved slightly, the digital course map can be updated to account for a change in relative position between the COG and the cup. Furthermore, in the case where positional information is displayed on display board 54 to a golfer which indicates distance to a green and hole, the respective distances and positions to landmarks on the course can be updated to display to a golfer, for example, the distances to each landmark, as well as the cup (or COG).

It is to be understood that the invention is not limited to the exact construction illustrated and described above, but that various changes and modifications may be made without departing from the spirit and scope of the invention as defined in the following claims.

I claim:

1. A golf information system for providing a golfer with information regarding the position and distance of designated features on a golf course having a plurality of golf holes comprising:

golfer locating means which moves with the golfer for receiving signals and generating a golfer location signal which locates the golfer on the golf course, and

location interpreting and comparing means which moves with the golfer for interpreting said golfer location signal via a memory, said memory constructed and arranged for storing coordinate data of landmarks comprising topographical features of the golf course, and including means for designating a plurality of zones for one or more of each of the golf holes on the golf course, and relating specific subsets of said landmark coordinate data to each of said zones and comparing a difference in position of said golfer location signal to one or more of said landmark coordinate data assigned to one of said zones on the golf course where the golfer is located, said location interpreting and comparing means relaying said difference in position as a distance between said landmarks associated with said zone and said golfer locating means to output means for outputting said information to the golfer, and said location interpreting and comparing means passively providing said information to said golfer without golfer input,

each of the plurality of holes on the golf course divided into a plurality of said zones, each of said zones including at least one memory stored landmark location mapped to said zone and retrievable from memory in response to detection of one of said golfer location signals present within said zone, and

means for detecting a stopped condition of the system, wherein the system automatically calculates said golfer location signal in response to said detected stopped condition, presence in one of said zones is determined via retrieval from memory, landmarks assigned to said

14

zone are recalled from memory along with landmark coordinate data, and distances are calculated between each of said retrieved landmarks and said golfer location signal.

2. The golf information system of claim 1 wherein said stopped condition is detected by a sensor on a golf cart or by global positioning satellite technology.

3. The golf information system of claim 1 wherein the system automatically outputs personal club selection suggestion based on golfers personal input into a memory file.

4. A method for determining the position of a golf ball relative to known locations on a golf course using a GPS system comprising the steps of:

locating the positions of a plurality of landmarks on the golf course;

defining a plurality of regions on the golf course, each of said regions mapped in relationship to a green having a cup on the golf course;

mapping at least one of said landmarks to one of said regions;

storing in memory the definitions of each of the regions in combination with region mapping information;

storing the position of the green in memory;

positioning a remote GPS receiver near the golf ball on the golf course;

determining the position of the remote receiver using the GPS system;

determining the region in which the golf ball is located on the course from such position wherein said mapping region information pertaining to a particular hole are automatically retrieved upon the remote receiver's presence in a certain region;

recalling such landmarks present in such golf ball region;

determining the distance from the remote receiver to such landmarks using previously stored landmark position information, such mapping region information, and the position of the GPS receiver; and

displaying distances from the remote receiver to the cup and landmarks mapped with such region.

5. A method of claim 4 wherein said landmarks are mapped into memory from a digitized aerial photograph calibrated by geodetic survey techniques creating a digital data base.

6. The method of claim 5 wherein further landmark locations are taken from an x,y coordinate grid of said digital data base.

7. A golf information system for providing a golfer with information regarding the position and distance of designated features on a golf course having a plurality of golf holes comprising:

golfer locating means which moves with the golfer for receiving signals and generating a golfer location signal which locates the golfer on the golf course; and

location interpreting and comparing means which moves with the golfer for interpreting said golfer locating signal via a memory, said memory constructed and arranged for storing coordinate data of landmarks comprising topographical features of the golf course, and including means for designating a plurality of zones on the golf course, and relating specific subsets of said landmark coordinate data to each of said zones and comparing a difference in position of said golfer location signal to one or more of said landmark coordinate data assigned to one of said zones for one or more of each of the golf holes on the golf course where the

5,685,786

15

golfer is located, said location interpreting and comparing means relaying said difference in position as a distance between said landmarks associated with said zone and said golfer locating means to output means for outputting said information to the golfer;

said location interpreting and comparing means passively providing said information to said golfer without golfer input;

wherein said output means is configured for outputting non-golf information to the golfer while said golfer locating means is in motion between stationary positions.

**8.** The golf information system of claim **7** wherein said non-golf information comprises product or service advertisements or endorsements.

**9.** The golf information system of claim **7** wherein said non-golf information is associated with at least one of said zones and said non-golf information is outputted only when the golfer is located within said at least one associated zone and said golf locating means is in motion between said stationary positions.

**10.** A golf information system for providing a golfer with information regarding the position and distance of designated features on a golf course having a plurality of golf holes comprising:

golfer locating means which moves with the golfer for receiving signals and generating a golfer location signal which locates the golfer on the golf course,

location interpreting and comparing means which moves with the golfer for interpreting said golfer location signal via a memory, said memory constructed and arranged for storing coordinate data of landmarks comprising topographical features of the golf course, and including means for designating a plurality of zones for one or more of each of the golf holes on the golf course, and relating specific subsets of said landmark coordinate data to each of said zones and comparing a difference in position of said golfer location signal to one or more of said landmark coordinate data assigned to one of said zones on the golf course where the golfer is located, said location interpreting and comparing means relaying said difference in position as a distance between said landmarks associated with said zone and

16

said golfer locating means to output means for outputting said information to the golfer, and said location interpreting and comparing means passively providing said information to said golfer without golfer input, and

receiver means for receiving golf related information from a transmitting station wherein said received information comprises golf related information and further comprises golf tournament standings information.

**11.** A golf information system for providing a golfer with information regarding the position and distance of designated features on a golf course having a plurality of golf holes comprising:

golfer locating means which moves with the golfer for receiving signals and generating a golfer location signal which locates the golfer on the golf course,

location interpreting and comparing means which moves with the golfer for interpreting said golfer location signal via a memory, said memory constructed and arranged for storing coordinate data of landmarks comprising topographical features of the golf course, and including means for designating a plurality of zones for one or more of each of the golf holes on the golf course, and relating specific subsets of said landmark coordinate data to each of said zones and comparing a difference in position of said golfer location signal to one or more of said landmark coordinate data assigned to one of said zones on the golf course where the golfer is located, said location interpreting and comparing means relaying said difference in position as a distance between said landmarks associated with said zone and said golfer locating means to output means for outputting said information to the golfer, and said location interpreting and comparing means passively providing said information to said golfer without golfer input, and

receiver means for receiving information from a transmitting station wherein said received information comprises non-golf related information.

**12.** A golf information system of claim **11** wherein said non-golf related information comprises product or service advertisements or endorsements.

*    *    *    *    *

```
08CV4028
JUDGE KENDALL
MAGISTRATE JUDGE COX

PH
```

# EXHIBIT B



# United States Patent [19]

## Bianco et al.

US005438518A

[11] Patent Number: **5,438,518**

[45] Date of Patent: **Aug. 1, 1995**

[54] **PLAYER POSITIONING AND DISTANCE FINDING SYSTEM**

[76] Inventors: **Joseph A. Bianco**, 112 Rising Trail Dr., Middletown, Conn. 06457; **Curtis A. Vock**, 28 Federal St., 30-12, Salem, Mass. 01970; **John V. Bianco**, 24 Calvin Rd., Jamaica Plain, Mass. 02130

[21] Appl. No.: **183,594**

[22] Filed: **Jan. 19, 1994**

[51] Int. Cl.⁶ ........................ G01S 5/14; A63B 71/06; A63B 57/00

[52] U.S. Cl. .................................... 364/460; 364/411; 364/561; 273/32 R; 273/32 H; 340/995

[58] Field of Search ............... 364/449, 444, 410, 411, 364/561, 460; 342/357, 450, 451, 457; 273/32 R, 32 H; 340/995

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,805,411 | 4/1974 | Andrews, Jr. ...................... 35/7 R |
| 4,266,214 | 5/1981 | Peters, Jr. ...................... 340/323 R |
| 4,297,701 | 10/1981 | Henriques ...................... 343/6.5 LC |
| 4,321,678 | 3/1982 | Krogmann ...................... 364/453 |
| 4,367,526 | 1/1983 | McGeary et al. .................. 364/411 |
| 4,480,310 | 10/1984 | Alvarez ...................... 364/450 |
| 4,547,781 | 10/1985 | Gelhorn et al. .................. 346/33 R |
| 4,655,451 | 4/1987 | Townsley ...................... 273/32 H |
| 4,665,404 | 5/1987 | Christy et al. .................. 342/463 |
| 4,698,781 | 10/1987 | Cockerell, Jr. .................. 364/561 |
| 4,703,444 | 10/1987 | Storms, Jr. et al. .............. 364/561 |
| 4,731,613 | 3/1988 | Endo et al. ...................... 342/357 |
| 4,815,020 | 3/1989 | Cormier ...................... 364/709.11 |
| 4,864,592 | 9/1989 | Lee ...................... 377/5 |
| 4,879,658 | 11/1989 | Takashima et al. ................ 364/449 |
| 4,887,281 | 12/1989 | Swanson ...................... 377/24.1 |
| 4,910,677 | 3/1990 | Remedio et al. .................. 364/410 |
| 4,922,444 | 5/1990 | Baba ...................... 364/566 |
| 5,044,634 | 9/1991 | Dudley ...................... 273/32 R |
| 5,056,106 | 10/1991 | Wang et al. ...................... 375/1 |
| 5,058,023 | 10/1991 | Kozikaro ...................... 364/450 |
| 5,214,679 | 5/1993 | Metcalf ...................... 377/5 |
| 5,225,842 | 7/1993 | Brown et al. .................. 342/357 |
| 5,245,537 | 9/1993 | Barber ...................... 364/410 |
| 5,319,548 | 6/1994 | Germain ...................... 364/410 |
| 5,324,028 | 6/1994 | Luna ...................... 273/32 R |
| 5,364,093 | 11/1994 | Huston et al. .................. 273/32 R |

### OTHER PUBLICATIONS

GPS Technology and Opportunities; Harris et al; Paper Presented at Expo Comm China '92; Beijing, China; Oct. 30–Nov. 4.

Julpe, "You're never out of range of the master–Sahara unveils computerized 'caddy'", *Sahara Country Club Sports,* Las Vegas Sun (undated).

Carey, "Sextants in Space Can Change the World" Wall Street Journal (1993).

Webster, "Device hastens flood aid", The Arizona Republic, pp. B4–B5 (Sep. 7, 1993).

Chien, (Illustration by Dimare) "You Are Here", Popular Mechanics, pp. 50–52 (Nov. 1993).

Robinson, *Abstract* "Using Bus Level IRIG Time Code Translators To Time Tag Data And Synchronize Multiple Processing Stations" (undated).

(List continued on next page.)

Primary Examiner—Michael Zanelli
Attorney, Agent, or Firm—John V. Bianco; Curtis A. Vock

[57] **ABSTRACT**

The invention relates to a portable distance tracking system for use by a player on a playing field. The system includes a mobile interface unit that has a memory element, position interface electronics, a data processor, and a player interface. The memory element stores digitized map representations of playing fields. The position interface electronics receivers position indicative signals that are representative of a geographical location of the mobile unit from an external source. The data processor couples to the memory element and to the position interface electronics and correlates the geographical location to a field location of the mobile interface unit on the playing field. The processor also determines the distance from the mobile interface unit to a first landmark. The player interface is coupled to the data processor and communicates the distance between the mobile interface unit and the first landmark to the player. According to a preferred embodiment, the playing field is a golf course and the first landmark is a flag location at a select hole on the golf course.

**43 Claims, 11 Drawing Sheets**



5,438,518

Page 2

## OTHER PUBLICATIONS

Freeman, "Physical Engineering", Popular Mechanics, pp. 33–35 (Dec. 1993).

Cannon et al., "Testing a Lightweight GPS/GIS Terminal for Sub–Meter DGPS Positioning", ION GPS93, Salt Lake City (Sep. 22–24, 1993).

Ellowitz, "The Global Positioning System", Microwave Journal, pp. 24–33 (Apr. 1992).

Ardö et al., "On the accuracy of the global positioning system–A test using a hand–held receiver", 13 Int. J. Remote Sensing, 3229–3233 (1992).

Gibbons, "The Global Positioning System as a Complementary Tool for Remote Sensing and other Applications", 58 Photogrammetric Eng. & Remote Sensing, 1255–1257 (Aug. 1992).

Soler et al., "Accurate Determination of Cartesian Coordinates at Geodetic Stations Using the Global Positioning System", 19 Geophys. Res. Letters, 533–536 (Mar. 20, 1992).

Horiai, "Accuracy of time comparison derived from reception of Loran–C and Global Positioning System time signals", 27 Radio Sci., 545–551 (Sep.–Oct. 1992).

Wassef et al., "An Investigation into the Integrity of Surveying With the Global Positioning System (GPS)", 14 J. Geodynamics, 51–58 (1991).

Publication "Sensor Markets and Technologies Update;

Riegl USA Senses Pulse of Laser Rangefinder Market", Vital Information Publications (Monday, Nov. 15, 1993).

Gething, "Radio Direction Finding and Superresolution", Peter Peregrinus Ltd. on behalf of the Institution of Electrical Engineers, Chapters 1–3, 5, and p. 1 of Chapter 7 (undated).

Motorola GeoResearch, Inc. product information sheet "GeoLink Mapping System ® Live Map TM" (undated).

Motorola brochure "LGT 1000 TM Terminal Lightweight GPS/GIS Terminal" (Mar., 1993).

Motorola brochure "Sixgun TM 6000 Series DGPS Receivers and DGPS Systems" (1993).

Datum, Inc. data information sheet "bc63 VME/bc357VXI GPS Satellite Receiver" (1991).

Datum, Inc. data information sheet "bc627AT GPS Satellite Receiver" (1991).

Datum, Inc. data information sheet "TYMSERVE TM 2000 LAN Time Server" (1993).

RangeMaster TM Golf Enterprises product information sheet "A Yardage Based Course Management System" (undated).

RangeMaster TM Golf Enterprises product information sheet (undated).



*FIG. 1*



FIG. 2

**U.S. Patent**     Aug. 1, 1995     Sheet 3 of 11     **5,438,518**



*FIG. 3*



**FIG. 4**



**FIG. 4A**



*FIG. 5*



*FIG. 6*



**FIG. 7**



*FIG. 8*



## FIG. 9



**FIG. 10**



FIG. 11

5,438,518

1

# PLAYER POSITIONING AND DISTANCE FINDING SYSTEM

## BACKGROUND OF THE INVENTION

This invention relates generally to an electronic system for providing information to players on a playing field. More particularly, it relates to a system for determining the position of a golfer on a golf course and for communicating that position along with other relevant information to the golfer.

There are many thousands of golf courses in the United States and abroad, and tens of millions of people who play golf. Some people who play golf regularly do so at the same course. However, quite often golfers playing at a course are unfamiliar with the course topography. To accommodate these players, course operators provide maps, usually as part of a score card, which illustrate the layout of the course and which indicates the distance from the tee to the flag for each hole. Additionally, the courses usually include distance markers placed at various locations along the course. By way of example, at golf courses located in the United States, each hole typically includes a distance marker located along the fairway to indicate when a golfer is 150 yards from the flag.

In addition to such aids provided by golf courses, there are also a variety of prior art distancing and ranging devices. These devices can include systems for assisting a golfer's performance. They can also include some mechanism for attempting to measure distances between a golfer and a variety of landmarks on a golf course. Such prior art devices employ a variety of methods to perform distance measurements. Some rely on visually siting the flag, while others require the flag to act as a receiver or transmitter of some sort. Other prior art systems rely on developing a coordinate system for the golf course and use linear accelerometers to track a golfer's movement along the course. Yet other systems require the golf course to install tracking sensors below the fairway turf.

There are several drawbacks with regard to the prior art systems for informing golfers as to their position on a golf course. One drawback is that the maps provided are usually very small; typically all eighteen holes are contained on a card that is approximately 3″×5″ in size, thus lacking sufficient detail. By way of example, the maps often provide the distance from the tee to the flag and the general shape of the fairway, but fail to indicate the location of hazards such as accumulations of water and sand traps. Even when a course map depicts hazards, it virtually never provides distances to those hazards, nor does it typically provide other important distances, such as to the front of the green or to the back of the green. Another drawback is that the maps and markers which the course operators provide are often not up to date. As a golf season progresses, courses can become worn from over-use. Consequently, course operators periodically relocate the tees and the flags. As a result, the distance information provided by the maps and the markers is often inaccurate. A further drawback of the prior art systems is that the distance markers positioned on the course are sometimes difficult to locate. Often, for example, common looking shrubs are used as distance markers. At other golf courses, small stakes are located along the edge of the fairway. Still

2

other courses place small metal or cement plates in the ground.

Because these distance markers are difficult to locate, and because the maps are very small, their usefulness is impeded for those who need them most: golfers who have never played the course and those golfers who are visually impaired.

Another significant drawback in prior art golf location systems that utilize a score card and accompanying map is that it is difficult for a golfer to track historical information with regard to play at a particular course. Accordingly, unless a golfer takes notes and saves old score cards, it is virtually impossible for the golfer to recollect performance on a given hole, particularly if the golfer only plays a course a few times each year. Consequently, no effective learning occurs, even if the golfer encounters the same situation more than one time.

Other more automated prior art systems also suffer from several disadvantages. Certain of those systems require siting the flag to operate continuously. Consequently, if a player cannot see the flag, that player cannot use the system to determine distance. This situation can be exacerbated by players forgetting to replace the flag. Another disadvantage to some prior art golf location systems is that they require special tracking sensors to be installed. Such installation can be labor intensive and also disruptive to play. Additionally, maintenance of the tracking systems can be costly. Furthermore, other prior art electronic systems are typically complex and expensive, in the methods employed to acquire positional information.

Accordingly, one object of the invention is to provide golfers with information regarding their position on a golf course.

Another object of the invention is to provide golfers with information regarding their distance to the flag.

An additional object of the present invention is to provide golfers with information regarding distances to hazards on a golf course.

A further object of the invention is to provide golfers with accurate distance information on a golf course, regardless of the movement of the tees and the flags.

Another object of the present invention is to provide golfers with adaptive information regarding proper club selection.

An additional object of the present invention is to provide visually impaired golfers with positional, distance, and other related information in a conveniently usable format.

Other general and specific objects of the invention will in part be obvious and will in part appear hereinafter.

## SUMMARY OF THE INVENTION

The invention relates generally to an electronic system for providing information to players on a playing field. More particularly, the invention provides a portable distance tracking system for determining the position of a player and for communicating that position, along with other relevant information to the player.

According to one embodiment of the invention, the playing field includes at least a first landmark and the tracking system comprises at least one mobile interface unit. The mobile interface unit includes a memory element, position interface electronics, a data processor, and a player interface. The memory element stores digitized map representations of at least one playing

5,438,518

**3**

field. In one preferred embodiment, the playing field is a golf course and the map representations are digitally scanned arial photographs of the golf course. As those skilled in the art will appreciate, any number of conventional methods of digitizing map information can be employed to store a representation of the playing field in the memory element. According to a further embodiment, the memory element is replaceable. In this way, different memory elements containing different playing fields can be swapped in and out of the mobile interface unit. Thus, in the case of the playing field being a golf course, a golfer can insert a particular memory element, which is dependent upon which golf course is to be played. Alternatively, a single memory element can contain map representations for a plurality of playing fields, thereby reducing the frequency with which the memory element need be replaced. Alternatively, the memory element is updateable and is overwritten with new golf course information via a data link interface.

The position interface electronics receive position indicative signals from an external source. The position indicative signals are representative of a location of the mobile interface unit. According, to one embodiment, the position interface electronics receives the position indicative signals from a global positioning system satellite constellation located in orbit around the Earth. In this case, the signals from the constellation provide the position interface electronics with the geographical position of the mobile interface unit.

The invention can also employ a differential global positioning system. According to the differential system, a master global positioning system unit is located at a fixed location having a known longitude and latitude. The master unit receives the position indicative signals from the satellite constellation, calculates its longitude and latitude, and transmits an error correction signal to the mobile interface unit, wherein the error correction signal is based at least in part on a difference between said known longitude and latitude and the calculated longitude and latitude. The mobile interface unit receives the error correction signal from the global positioning system master unit, and processes the error correction signal with the position indicative signals to determine a corrected geographical position of said mobile interface unit.

The data processor couples to the memory element and to the position interface electronics and correlates the geographical location of the mobile interface unit with the digitized map representation of the playing field to determine a field location of the mobile interface unit on the playing field. The data processor also determines the distance between the mobile interface unit and the first landmark. The player interface, couples to the data processor and communicates at least the distance between the mobile interface unit and the landmark to the player.

In the case where the playing field is a golf course, the first landmark can be the flag location of a particular hole on the course. According to further embodiments, the player interface includes a keyboard interface and a visual display. The visual display can automatically provide a graphical display of a hole being played on the golf course. The display can show various landmarks, as trees, water hazards, boundary markers, sand traps, distance markers, the green location. In other aspects, the display also provides distances from the mobile interface unit to the displayed landmarks and also the distances between selected landmarks.

**4**

The keyboard enables the golfer to set certain initialization parameters and also to request various relevant information while playing a round of golf. By way of example, a golfer can set the distance that he or she expects to hit each golf club. According to one embodiment, during play the mobile interface unit displays club suggestions based in part on the golfer's distance from a particular landmark and in part on the club distances previously set. According to a further embodiment, the mobile interface unit automatically revises the club distances previously set in response to a golfer's actual performance. The keyboard also enables the golfer to enter for storage and/or display various information while playing a round of golf. For example, according to further embodiments of the invention, a golfer can enter the score on a particular hole, the number of penalty shots taken, and the number of putts taken. The memory element can store this information for later recall by the golfer.

According to another embodiment of the invention, the system includes a central computer. The central computer includes a communications link for interfacing with the mobile interface unit. The central computer can provide the mobile interface unit with such information as updated course information. Additionally, following a round of golf, the mobile interface unit can download such information as scores on each hole, number of putts on each hole, number penalty strokes, distances of particular shots and other like information. The central computer can then process, store and if requested print out reports in various formats concerning the downloaded information.

In still other aspects of the invention, the invention provides for a system which determines the distance to a hole on a golf course. A GPS receiver is arranged to receive a global earth position, and a processor subsystem communicates with the GPS receiver to correlate the GPS signals into a local position on the golf course. A memory element is also included to store locations on the golf course which include at least one hole of the golf course. The golf course locations are representations of the local coordinates wherein the processor correlates the GPS signals into the coordinates representing the golf course. The processing subsystem thus correlates the global earth position to the location on the golf course wherein the distance from the global earth position to the desired location is determined.

Preferably, the invention thus includes indication element, e.g., an LED or LCD display, for indicating the distance to a user of said system.

The invention also preferably incorporates a stationary differential GPS receiver/transmitter and a GPS receiver which is a differential GPS receiver. Such a differential GPS receiver receives and applies a correction signal from the stationary differential GPS receiver/transmitter which is arranged at a known global earth location geographically located with the golf course. The stationary GPS receiver/transmitter means operates in conjunction with the differential GPS receiver means and transmits the correction signal to the GPS receiver.

In certain aspects, the memory element also stores a second location of at least one object, e.g., a known hazard, on the golf course. The processor subsystem thus includes circuitry and programming to correlate the global earth position to the second location such that the distance between the global earth position and the second location is determined.

5,438,518

5

In another aspect of the invention, the processor subsystem includes a memory load subsystem which communicates coordinates representative of at least one location of the golf course to the memory element.

In still another aspect of the invention, a local memory storage element is included which stores coordinates representative of the golf course. The local memory storage element is generally provided at a stationary location, e.g., at the club house, so that users can load the coordinates of the current golf course into the inventive system. The memory load subsystem thus is adapted for selective communication with the local memory storage element wherein the memory load subsystem communicates the coordinates representative of the golf course to the memory element for storage in the memory element.

In yet another aspect according to the invention, there is provided a system for determining the distance to a hole on a golf course. The system includes (i) a GPS receiver arranged to receive a global earth position; and (ii) a processing subsystem, i.e., including a microprocessor, in communication with the GPS receiver. The processing subsystem includes a memory element for storing a location of at least one hole of the golf course, and a correlation processor for correlating the global earth position to the location, such that the distance from the global earth position to the location is determined.

In this way it can be seen that the invention provides golfers with a portable system for tracking position on a golf course. It also provides golfers with a convenient mechanism for logging relevant performance information while playing a round of golf and for reviewing that information at a later time. Furthermore, the invention provides golfers with accurate distance measurements to landmarks on a golf course.

BRIEF DESCRIPTION OF THE DRAWINGS

For a better understanding of the nature and objects of the invention, reference should be made to the following detailed description and the accompanying drawings, in which:

FIG. 1 shows a block diagram of a player positioning system according to one embodiment of the invention;

FIG. 2 depicts a mobile interface unit particularly adapted for operation on a golf course;

FIG. 3 shows one preferred embodiment of the display portion of the mobile interface unit of FIG. 2;

FIG. 4 shows an alternate embodiment of the mobile interface unit of FIG. 2;

FIG. 4A shows an alternate embodiment of the display portion of the mobile interface unit of FIG. 4;

FIG. 5 is a schematic illustration depicting one embodiment of the positioning system of FIG. 1, adapted for receiving positional information from Global Positioning System satellites;

FIG. 6 is a diagram depicting one embodiment of the position interface electronics of FIG. 1, adapted for receiving positional information from a sensor mounted to the wheel of a golf cart;

FIG. 7 is a diagram illustrating one embodiment of the positioning system of FIG. 1, adapted for receiving positional information from a plurality of ground based transmitters;

FIG. 8 is a diagram illustrating one embodiment of the positioning system of FIG. 1, adapted for receiving positional information from two ground based transmitters;

6

FIG. 9 is a diagram illustrating one embodiment of the positioning system of FIG. 1, adapted for receiving positional information from a plurality of ground based acoustic transducers;

FIG. 10 illustrates one method of digitizing a playing field for storage in the memory unit of FIG. 1; and

FIG. 11 shows a schematic block diagram of a central computer interfacing with the mobile interface unit of FIG. 1, in accord with the invention.

DETAILED DESCRIPTION

FIG. 1 shows a block diagram of a player positioning system 100 according to one embodiment of the invention. The illustrated embodiment 100 includes a mobile interface unit 102 that determines a player's position on a playing field from externally provided signals 114, and relays that positional information, along with other relevant information, to the player. According to a preferred embodiment, the unit 102 is kept in close proximity to the player, and includes a processor 104, position interface electronics 106, a user input interface 108, a display 110, and memory 112. The unit 102 can also optionally include an audio interface 116.

The position interface electronics 106 receives externally generated positional information signals 114. The signals 114 can come from a variety of sources, such as, for example, the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters, electromechanical sensors, or ground based acoustic transducers, all of which are discussed in further detail below. Following initial processing of the signals 114, the interface electronics 106 then couples information gleaned from those signals to the processor 104.

The memory 112 can store, among other information, digitally encoded positional information, such as digitized maps, for one or more particular playing fields. According to one embodiment, a portion 112a of the memory 112 can be removed and replaced with digitized maps of a plurality of playing fields. In this way, the system can be easily adapted for use at a variety of locals. The processor 104 determines a player's position on the playing field by correlating the positional information signals provided by the interface electronics 106 with the digitized map information stored in the memory 112. Once the processor 104 determines the players position, it conveys that information to the player by way of the display 110, or optionally by way of the audio interface 116.

Quite often players desire additional information besides their position. One sport where players desire such additional information is golf. The user interface 108, which by way of example can be a keyboard, enables golfers to query the processor 104 as to distance and performance related information. For instance, according to one embodiment, a golfer can request the distance to a particular flag, or to a hazard, such as sand trap, pond or tree. According to a further embodiment, golfers can request information regarding the distance between any two of a plurality of landmarks, such as between the tee and the flag of a particular hole or the distance to the club house. The unit 102 provides the requested information by way of the display 110 or the audio interface 116.

FIG. 2, depicts a mobile interface unit 200 of the type shown in FIG. 1, but particularly adapted for operation on a golf course. The unit 200 includes a display 202 and keyboard interface 204. The display 202 can display both graphics and alphanumeric characters. The key-

5,438,518

7

board 204 includes keys that can be generally grouped as numerical keys 204a and keys that can be grouped as command keys 204b. The unit 200 also includes an on/off switch 206, a digital input/output interface 208 and a removable memory module 210.

During operation, a player can perform a variety of initialization procedures. First, the player can enter a numerical code which designates the particular golf course to be played. The golfer accomplishes this by actuating the "COURSE" command key followed by actuating the numerical keys corresponding to the desired course, followed by actuating the "ENTER" command key. In response, the processor 104 accesses the map for the selected course from the memory 112, and the display 200 shows the selected course code in the "COURSE:" field. According to alternative embodiments, the golfer can change the memory module 210 to provide the appropriate course map or can receive, through the interface 208, a signal from the club house that automatically sets the appropriate course selection code. The mobile unit can process externally generated position indicative signals received via the interface electronics 106 to automatically determine which particular golf course a golfer has selected to play. In response to that determination, the processor 104 can then access the digitilized map information stored in memory 112 for the particular golf course. The processor 104 can also signal the display 110 to display an identification code assigned with the particular golf course. According to a further embodiment, particular golf courses can provide mobile interface units 200 to the golfers, in which case the course can program the appropriate course map into the memory 112 before time. Where the golf course provides either the memory modules or the entire unit 200, up to date topography changes in the course can be incorporated into the digitized memory map. This can be easily accomplished via a central base computer such as that shown in FIG. 11 at 1000, located in the club house. Accordingly, in one embodiment, the, the invention provides a centralized computer 1000, typically at the club house, for storing day-to-day course data.

The mobile unit 200 can accommodate a plurality of golfers (typically four in one preferred embodiment). Consequently, according to one embodiment, whenever taking advantage of any of the programming features of the unit 200, the golfer first actuates the "PLAYER" command key followed by a player code, e.g., 1, 2, 3, 4, etc.

One feature that the golfer can program into the memory 112 is the distance that he or she normally hits a golf ball with each club or with any subset of clubs. To enter the program clubs mode, the golfer actuates the "PROG. CLUBS" command key. Next, the golfer actuates the "CLUB CHOICE" command key, followed by the numerical designation of the club to be set followed by the "ENTER" command key. By way of example, to select the five wood, the golfer actuates the "WOOD" key, followed by the "5" key, followed by the "ENTER" key. In response, the display 202 indicates a "5 wood" in the "CLUB CHOICE:" field. Next, the golfer actuates the "DIST. HIT" command key followed by the numerical keys corresponding to the desired distance, followed by the "ENTER" key. The display 202 then shows the selected distance (e.g., 180 yds.) in the "DISTANCE:" field. To program distances for additional clubs, the golfer repeats the above sequence of commands, or alternatively, to program the

8

next club in sequence, the golfer can actuate the "NEXT" command key. To exit this mode of operation, the golfer simply actuates the "PROG. CLUBS" command key a second time. If a golfer chooses not to program club distances, the unit 200 can use a default set of parameters, e.g., a five iron for a 150 yard shot etc. Using the above described procedure, a golfer can alter any or all of the default distance parameters.

FIG. 3 shows the display 202, according to one embodiment of the invention and for one exemplary hole. As can be seen, the display 202 includes a graphical display portion 202a and an alphanumeric display portion 202b. Once the course selection has been programmed and any desired initialization has been performed, the unit 200 is ready for use. Prior to teeing off, the golfer can select the hole to be played. This is accomplished by actuating the "HOLE" command key followed by actuating the numerical designation for the hole (e.g., 01, 02, . . . , 18), followed by actuating the "ENTER" command key. In response, the display 202b indicates the designation for the selected hole in the "HOLE:" field. Alternatively, as a golfer approaches the tee for a particular hole, the unit 200 can receive a signal, via the interface 114, that automatically programs the hole to be played. Additionally, in response to receiving the hole designation, the processor 104 accesses map information stored in memory 112 and transmits this information to the display 200. The display 200 provides a graphical representation of the selected hole in field 202a. As can be seen from the illustrative hole shown in field 202a, all significant features of the hole being played, including the tee 2, the green 8 and various landmarks and hazards 3 through 7 can be displayed. Additionally, the processor correlates the position information provided by the position interface electronics 106 with the map information provided by the memory 112 to determine the position of the mobile unit 200 on the golf course. The golfer's position is illustrated on the display 202a by the character at 1. The processor also accesses other relevant information regarding the hole being played from the memory 112 and automatically displays that information in the display portion 202b. Such information includes par, handicap, and distance from the tee to the flag for the hole. This information is displayed in the "PAR:", "HDCP:", AND "DISTANCE:" fields, respectively. Just prior to playing the hole, the golfers select which golfer is about to play. That golfer's code, e.g., 1, 2, 3, 4, etc. appears in the "PLAYER:" field.

As the golfer plays each hole, the mobile unit 200 can provide considerable information. For example, according to one preferred embodiment, the unit 200 automatically displays the distance from the mobile unit 200 to the flag. By request, the unit 200 can also provide a golfer with the distance from the mobile unit 200 to any of the landmarks shown in the graphical display 202a. To determine such distances, the golfer actuates the "TO" command key, followed by the numerical designation for the landmark. In response, the unit 200 displays the landmark designation in the "TO:" field and the requested distance in the "DISTANCE:" field of display 202a. According to a further embodiment, the unit 200 can also provide a golfer with the distance between any two of the landmarks shown in the graphical display 202a. To determine such distances, the golfer actuates the "FROM" command key, followed by the numerical reference designation of the first landmark of interest. In response, the display 202b indicates

5,438,518

9

the selected reference designation in the "FROM:" field. Next, the golfer actuates the "TO" command key followed by the numerical reference designation for the second landmark of interest. In response, the display 202*b* shows that reference designation in the "TO:" field. The processor 104 then accesses the map information in the memory 112, calculates the distance between the two selected reference designations, and couples the calculated distance to the display 202*b*. The display 202*b* then indicates this distance information to the golfer in the "DISTANCE:" field. To reenter the mode of automatically displaying the distance between the mobile unit 200 and the flag 9, the golfer simply actuates the "TO" command key, followed by the reference designation "1".

Alternative to the above description, the display 202*a* can show the distance to each hazard or other object automatically by overlying the distance information from the player to each reference on the display and at the location of each hazard or object.

The processor can also automatically accesses the club distance information (either the default parameters or those previously programmed by the golfer, as may be appropriate) and display a club suggestion for each shot. The display 202*b* indicates the club suggestion for each shot in the "CLUB SUG:" field. The golfer can also enter his or her actual club choice by actuating the "CLUB CHOICE" command button, followed by the "ENTER BUTTON" followed by the "STORE" command key. The processor 104 displays the new club choice in the "CLUB CHOICE:" field in the display 202*b*. The golfer can also enter the distance that he or she hit the ball using that particular club choice. The distance he hit is displayed in the "DIST. HIT" field. The processor automatically stores the displayed club choice, distance, course and hole information, and golfer position information for the particular hole. The processor 104 also uses this information to automatically update the golfers distance selection for the particular club selected. If the golfer repeats this procedure for each shot taken on the hole, a complete record of play on that hole will be stored. To recall this information at a later time, the golfer actuates the "RECALL" command key, and then specifies the course and hole of interest. To review successive shots, beginning at a particular hole, the golfer actuates the "NEXT" command key. In this way golfers can review their play on troublesome holes, and learn to avoid repeatedly making the same mistakes, such as incorrect club selection for particular shots.

As shown in FIG. 11, optionally the golfer can down load information regarding the round of golf to the central computer located in the clubhouse. The central computer 100 can include an input/output interface 1002, a processor 1004, memory 1006, and a printer 1008. To down load information regarding a round of golf, the golfer simply provides the course operator with his removable memory module 210 or alternatively attaches the unit 200 to the central computer 1000 by way of input/output interface 1002 the serial interface 208. The central computer 1000 can access the memory module 210, store the data, and process the data in processor 1004, and print the data on printer 1008 in any number of formats, depending on the personal preference of the golfer.

The mobile unit 200 can also provide the golfer with a convenient system for keeping score. Following the completion of a hole, the golfer can actuate the

10

"SCORE" command key followed by the score for that hole. The processor 104 updates the golfer's score and transmits the updated score to the display 202*a*. The display 202*a* in turn displays the score for the hole just played in the "SCORE:" field and also displays the updated total score in either the "BACK NINE:" or "FRONT NINE:" fields, as appropriate. The golfer can also enter any penalties for the hole by actuating the "PENALTY" command key. This will signal the processor to update the score for the hole accordingly. Additionally, the golfer can track how many putts were taken by actuating the "PUTTS" command key.

While the above description addresses various features of the present invention, those skilled in the art will appreciate that the description of the particular implementation of those features, such as the particular command keys included and their arrangement, along with the particular layout of display is illustrative in nature. By way of example, the display 202*b* depicts various information being displayed simultaneously. However, according to other embodiments within the scope of the invention, information can be displayed as a sequence of user interface dialogs, employing a tool bar and various menus, and being initiated by a golfer actuating a particular command key. Additionally, command keys can share various functions. In this way, the display can be made smaller, and the number of command keys can be reduced. Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play. Also, the alphanumeric display 202*b* can be integrated with the graphical display 202*a*, to further conserve on display space.

As in any electronic system, the information that can be conveniently received from and conveyed to a user is at least in part dependent on the size of the system and the power consumed by the system. Consequently, as the unit 200 is made larger, more of the above described features can be included and the display can be more detailed. According to one preferred embodiment, the mobile unit 200 can be mounted to a drivable golf cart. According to a further embodiment, the drivable golf cart can provide the power required by the unit 200, thus enabling the unit 200 to include a relatively detailed display 202 and a significant number of features such as described above. According to another embodiment, the unit 200 can be adapted to be either hand held or mounted to a pull-type golf cart. To provide for lower power consumption and convenience of size, the hand held and pull-type golf cart embodiments can be essentially paired down versions of the embodiment of FIG. 2. In the most paired down version, the unit simply provides the golfer with the distance from the mobile unit to the flag of the hole being played.

For example, FIG. 4 shows a portable display unit 300, particularly adapted for operation as a hand held unit or for mounting on a pull-type golf cart. As can be seen, the unit 300 includes a display 302 and a keypad interface 304. Like the unit 200 of FIGS. 2 and 3, the keypad interface 302 includes command keys 304*a* and numeric keys 304*b*. According to the depicted embodiment, the display 302 only includes alpha-numeric capabilities. However, according to other embodiments, a small graphical display portion, such as those employed on hand held video games can be incorporated. In the case where a graphical display is used, the unit 300 operates essentially identically to unit 200 of FIGS. 2

5,438,518

11

and 3. In the event that no graphics capability is included, a small map can be included to provide the reference designations for the landmarks that are located along the golf course. Alternatively, the unit **300** can be programmed to only provide the distance between the mobile unit **300** and the flag for the hole being played.

FIG. 4A illustrates one such embodiment which only provides the distance between the mobile unit **300** and the flag. According to the depicted embodiment, the display **302** is an LED or LCD display, such as those well known in the art. LED and LCD displays can be advantageous due to their small size, low power consumption and low cost.

As mentioned above, the positional information that the mobile unit processes to provide distance and other related information to a player can be derived from a variety of sources. By way of example, such sources can include the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters and receivers, electromechanical sensors operating in combination with a gyroscope, compass, and/or ground based acoustic transducers.

The GPS comprises a 21 NAVSTAR satellite constellation orbiting at 20,180 kilometers above the earth. These satellites provide real-time navigation and positioning information to anyone on earth with a GPS receiver. The operation of the GPS is conceptually straight forward. Each GPS satellite transmits a microwave radio signal that details the satellite identification number, its internal atomic clock, and the orbital location of the satellite (which is acquired through radar tracking). The elapsed time between the signal transmission, which is calibrated to an on-board atomic clock (typically either rubidium or cesium frequency standards), and the receipt at the ground-based GPS receiver, which has its own internal clock and antenna, divided by the speed of light, is roughly, the distance to one satellite. By computing the distance from each of three satellites, a triangulation is effected which enables the ground-based GPS receiver to determine its own position on the earth's surface. By computing the distance to each of four or more satellites, the ground-based receiver can determine its position in three dimensions, including height.

GPS receivers are available from a variety of manufacturers. By way of example, the GPS NAV 100 and the TRAXXAR 6 channel GPS are available from Motorola and Magellan, respectively. Typically, these receivers have location accuracies in the range of 25 meters. However, for greater accuracy, users can turn to differential GPS, commonly denoted as DGPS. DGPS is widely used. For example, the US. Coast Guard has initiated several reference stations around US. Coastal waters to provide DGPS to U.S. harbors. Likewise, the Federal Aviation Administration has installed advanced DGPS equipment at some airports to replace the older radio beacons and to improve location accuracy to approximately one foot.

Operationally, DGPS requires a local "master" GPS receiver which is positioned at a known location and linked to a transmitter, and a "slave" GPS receiver, which can be mobile. The master and the slave are linked together, for example, by a local UHF or VHF radio link. The master GPS receiver determines its coordinates from the GPS constellation, calculates a correction factor, and then transmits the correction signal to any slave in an extended geographical region

12

about the master via the local radio link. The slave processes the correction signal along with its own GPS-determined coordinates and determines the slave location at a significantly improved accuracy over normal GPS receivers. Ideally, the master GPS receiver/transmitter is located on slightly elevated ground relative to the slave units to reduce multipath interference. An example of a portable DGPS unit is the Motorola LGT 1000 TM Lightweight GPS/GIS terminal which has a probable location accuracy of 1–5 meters. Conveniently, two LGT 1000 TM systems operate to form a DGPS. One functions as the master and requires continuous operation power consumption at its external connector and one serves as the slave GPS and employs an internal battery. The accuracy of DGPS can be further improved by time integration. By way of example, to generate real-time information at approximately 1 Hz, the accuracy for present DGPS is approximately 1 meter.

FIG. 5 depicts a system **400** according to the invention which includes a mobile interface unit **402**, similar to the unit **102** of FIG. 1, that is adapted for operation with the GPS satellite constellation **404**. Also shown is the master GPS **406**, which can be located at the clubhouse **408**. Thus, in this embodiment, the slave GPS unit **410** becomes the position interface electronics **106** of FIG. 1 for the mobile interface unit **402**. As the mobile interface unit **402** traverses the exemplary hole **412**, the slave unit **410** receives transmissions from the constellation **404** and the master unit **406** to provide the mobile unit **402** with real-time, high accuracy positional information.

FIG. 6 is a schematic block diagram **500** of an alternate embodiment of the invention, wherein the position interface electronics **502** is adapted to process a signal from an electro-mechanical sensor **504** coupled to a wheel **506** of either a drivable or pull-type golf cart. As shown, the sensor can be coupled to the shaft **508** of the wheel **506**. However, depending on the particular device employed, the sensor **504** can be coupled to the spokes or even the hub of wheel **506**. According to one preferred embodiment, the sensor **504** is a light emitting device which couples a beam of light to the detector **510** each time the wheel **506** rotates. According to another embodiment, the device **504** can be a shaft encoder or an automobile type odometer. The detector **510** couples a digital signal, representative of one wheel revolution to the processor **512**. Additionally, the compass **514** provides the processor **512** with information indicative of the direction of the golf cart or pull cart. The processor **512** uses the information from the compass **514** and the detector **510** to determine the distance traveled and the direction in which that distance has been traveled. As long as the mobile interface unit is reset, either manually or automatically, at each hole, i.e., a vector, the embodiment of FIG. **6** provides accurate positional information to the flag.

FIG. 7 depicts a system **600** according to the invention and including a mobile interface unit **602**, adapted for operation with a plurality of ground-based transmitters **604**, **606**, and **608**. The mobile interface unit **602** includes the position interface electronics **610**, which is similar to the electronics **106** of FIG. 1. The position interface electronics **610** can receive and process signals **605** the antennas **604**, **606**, **608** as the mobile interface unit **602** traverses the hole **614**. According to one embodiment, antennas **604**, **606**, **608** are phased array microwave antennas and the interface electronics can

**13**

measure the phase difference between signals received via antenna **612** to determine the position of the mobile unit **610**. According to a further embodiment of system **600**, the interface electronics **610** processes the amplitude differences between the signals received from antennas **604**, **606**, **608** to determine the position of the mobile unit **602**.

While the system of FIG. 7 is depicted with three transmitting antennas **604**, **606**, **608**, two transmitting antennas can be employed with virtually identical results. More particularly, FIG. 8 shows a diagram of a system **700** which illustrates the use of two transmitting antennas **702** and **704** to provide positional information to the position interface electronics **710** of the mobile interface unit **706**. The system is depicted on an exemplary golf course **716**. With only two antennas **702** and **704** to provide positional information, there are two possible solutions for the position of the mobile unit **706**. However, the antennas **702** and **704** can be arranged such that one solution typically will fall outside the boundary for the hole being played. As in the case of the system of FIG. 6, the mobile unit **706** can process either phase or amplitude information from the antennas **702** and **704** to determine its position.

According to a further embodiment of the invention, the mobile interface unit can process acoustic data to determine its position on a playing field. Since sound travels at a known speed in atmosphere (340 meters/-second), it can be used like any other ranging system. Additionally, since sound travels at a much slower rate than does radio frequency or microwave frequency signals, the complexity of the electronics is greatly reduced. The transmitted sound can be non-audible so as not to disturb the quiet at the golf course.

FIG. 9 shows a schematic diagram of a representative hole **800** which illustrates the operation of a mobile interface unit **810** according to the invention and adapted for determining position from acoustic data. An acoustic sound generator **804** is located at the flag **806**. The generator **806** provides periodic acoustic energy pulses illustrated by sound waves **808**. The position interface electronics **812** receive the acoustic energy pulses by way of the acoustic transducer **814**, e.g. a microphone.

As discussed above, according to the invention, map information for various golf courses can be stored in the memory **112** of FIG. 1. One method of storing of map information is to create a cartesian coordinate grid **910** of the golf course. The grid **910** has an x-coordinate and a y-coordinate. FIG. 10 exemplifies a cartesian coordinate mapping according to one embodiment of the invention for a typical hole **900**. The hole **900** includes a fairway **902**, a green **903**, a clubhouse **904**, tee-off location **905**, and first and second reference locations **906** and **908**, respectively.

The hole **900** can be mapped into the coordinate grid **910** by any of a variety of methods. By way of example, the golf course can be arially scanned. According to one arial scanning method, an airplane flies over the golf course and employs a device such as a charge coupled device (CCD) scanner to scan the ground scene. The CCD scanner is comprised of an array of CCD elements. Typically, the CCD scanner extends transverse to the travel of the airplane. Thus, as the airplane travels along the direction of travel (e.g., along the "y" axis), an electronic slice of the course is created. Each CCD element acquires one pixel "P" image of the golf course. As shown in FIG. 10, at y-coordinate y1 a first

**14**

slice is taken traversing from x0 through xn. At y-coordinate y2 a second slice is taken, once again traversing from x0 through xn. This continues until similar scans are performed for coordinates y0 through yn. With the full image of the hole **900** electronically scanned, it can be stored in memory **112** and access by x- and y-coordinates. In an alternative embodiment, the hole **900** can be arially photographed and then the photograph can be digitally scanned into the memory **112**. Regardless of whether the hole **900** is scanned directly or a photograph or other rendition of the hole is scanned, the resolution of the stored image is directly proportional to the number of coordinate grids **908**. Thus, the more data points stored, the more precise the measurements which the positioning system **100** can perform.

As shown in FIG. 10, two reference locations of known longitude and latitude can be selected on the golf course. For example, one know location can be location **906** at the clubhouse **904**. Another known location can be some other arbitrary point **908**. With the resolution of the grid **910** known, the known points **906** and **908** can be used to map all other x-and y-coordinate locations to longitude and latitude locations. In this way, when the position interface electronics receives longitude and latitude information from the GPS constellation, for example, the processor **104** can combine the received information with the coordinate information stored in the memory **112** to determine the position of the mobile interface unit **200** on the golf course **900**.

It is accordingly intended that all matter contained in the above description or shown in the accompanying drawings be interpreted as illustrative rather than in a limiting sense.

It is also intended that the following claims cover all of the generic and specific features of the invention as described herein, and all statements of the scope of the invention which, as a matter of language, might be said to fall there between.

Having described the invention, what is claimed as new and secured by Letters Patent is:

1. A portable distance tracking system for use by a golfer on a golf course, wherein said golf course includes at least a first land mark, and wherein said system comprises at least one mobile interface unit including:

A. a memory element including means for storing digitized map representations of a plurality of golf courses;

B. position interface electronics including a first GPS receiver for receiving position indicative signals from a Global Positioning System satellite constellation located in orbit around the Earth, wherein said position indicative signals are representative of a geographical location of said mobile interface unit;

C. a data processor, coupled to said memory element and to said position interface electronics, and including means for processing said position indicative signals to determine said geographical location of said mobile interface unit, means for corresponding said geographical location of said mobile interface unit with said digitized map representations to automatically identify a particular golf course that a golfer has selected to play means for corresponding said geographical location of said mobile interface unit with said digitized map representation of said particular golf course to determine a field location of said mobile interface unit on said particular golf course, and means for determining a dis-

5,438,518

tance between said mobile interface unit and said first landmark; and

D. a player interface, coupled to said data processor, and including means for communicating at least said distance between said mobile interface unit and said first landmark to said player.

2. A portable distance tracking system according to claim 1 wherein said system further comprises a GPS master unit, wherein said GPS master unit is positioned at a fixed location having known longitude and latitude coordinates and includes:

A. a second GPS receiver for receiving said position indicative signals from said Global Positioning System satellite constellation, and a GPS processor having means for processing said position indicative signals to determine a calculated longitude and a calculated latitude for said fixed location of said GPS master unit, and

B. wireless transmission means for transmitting an error correction signal to said mobile interface unit, wherein said error correction signal is based at least in part on a difference between said known longitude and latitude and said calculated longitude and latitude, and wherein said position interface electronics includes wireless reception means for receiving said error correction signal from said GPS master unit, and said first GPS processor includes means for processing said error correction signal with said position indicative signals to determine a corrected geographical position of said mobile interface unit.

3. A portable tracking system according to claim 1 wherein said memory element includes a replaceable portion, for storing said digitized map representations of said plurality of golf courses.

4. A portable distance tracking system according to claim 1 wherein said mobile interface unit further comprises a keyboard interface coupled to said data processor and including means for entering commands and data into said mobile interface unit.

5. A portable distance tracking system according to claim 1 wherein said player interface includes a visual display including means for displaying information to a player.

6. A portable distance tracking system according to claims 1 wherein said player interface includes an audio interface for communicating information to a player.

7. A portable distance tracking system according to claim 1 wherein said data processor includes means for corresponding said geographical location of said mobile interface unit with said digitized map representation of said particular golf course to automatically identify which particular hole on said particular golf course golfer has selected to play.

8. A portable distance tracking system according to claim 1 wherein said interface further comprises a keyboard interface coupled to said data processor and including means for entering commands and data into said mobile interface unit, and a visual display interface having means for displaying entered commands and data.

9. A portable distance tracking system according to claims 8 wherein said keyboard interface includes means for selecting a particular hole on said particular golf course to be played by signaling said data processor to access a portion of said digitized map representation for said particular golf course from said memory element.

10. A portable distance tracking system according to claim 8 wherein said keyboard interface includes means for selecting a particular hole to be played on said golf course.

11. A portable distance tracking system according to claim 8 wherein said display includes means for displaying a par score associated with a selected hole to be played on said golf course.

12. A portable distance tracking system according to claim 8 wherein said display includes means for displaying a handicap associated with a selected hole to be played on said golf course.

13. A portable distance tracking system according to claim 8 wherein a particular hole has an associated flag location, said landmark is said associated flag location, and said display includes for displaying a distance between said mobile interface unit and said first landmark.

14. A portable distance tracking system according to claim 8 wherein a particular hole has a plurality of associated landmarks and said display includes means for displaying a distance between said mobile interface unit and one or more of said landmarks.

15. A portable distance tracking system according to claim 14 wherein said keyboard includes means for signaling said display to display a distance between said mobile interface unit and one or more of said landmarks.

16. A portable distance tracking system according to claim 8 wherein said display includes means for displaying a graphical representation of a particular hole selected to be played on said golf course.

17. A portable distance tracking system according to claim 16 wherein said particular hole has a plurality of associated landmarks and said graphical representation shows said location of said mobile interface unit in relation to one or more of said landmarks, and said mobile interface unit includes means for displaying a distance between said mobile interface unit and one or more of said landmarks.

18. A portable distance tracking system according to claim 8 wherein said system includes means for processing said position indicative signals to automatically determine which particular hole on said particular golf course a golfer has selected to play, and said display includes means for displaying a graphical representation of at least a portion of said particular hole.

19. A portable distance tracking system according to claim 8 wherein said system includes means for dynamically updating said displayed portion of said particular hole in dependence on said field location of said mobile interface unit.

20. A portable distance tracking system according to claim 8 wherein said memory includes means for storing nominal distance assignments for golf clubs, wherein said assignments are representative of how far a golfer nominally hits a golf ball with a particular golf club, and said keyboard interface includes means for enabling a player to signal said data processor to modify one or more of said nominal distance assignments.

21. A portable distance tracking system according to claim 20 wherein said data processor includes means for determining a suggested golf club selection based at least in part on said distance assignments and said distance between said mobile interface unit and said first landmark, and said display includes means for displaying said suggested golf club selection.

22. A portable distance tracking system according to claim 21 wherein said keyboard includes means for

5,438,518

17

overriding said suggested golf club selection by entering an alternative golf club choice.

**23.** A portable distance tracking system according to claim 22 wherein said data processor includes means for automatically updating said nominal distance assignments, based at least in part on said entering said alternative golf club choice.

**24.** A portable distance tracking system according to claim 21 wherein said keyboard includes means for entering an actual distance that said golfer hit with said suggested golf club selection.

**25.** A portable distance tracking system according to claim 24 wherein said data processor includes means for automatically updating said nominal distance assignments, based at least in part on said entering said actual distance.

**26.** A portable distance tracking system according to claim 8 wherein said particular golf course includes a plurality of holes to be played and said keyboard includes means for entering a hole score achieved by a golfer on said holes, said display includes means for displaying at least one of said hole scores at any particular time, said memory element includes means for storing said hole scores, and said processor element includes means for tallying said hole scores to determine a current total score equal to the sum of the scores of all holes thus far played.

**27.** A portable distance tracking system according to claim 8 wherein said keyboard includes means for entering number of putts taken on each of said holes and said memory element includes means for storing said number of putts.

**28.** A portable distance tracking system according to claim 8 wherein said keyboard includes means for selecting a particular number of golfers to share said mobile interface unit, said data processor includes means for associating an identification code with each of said number of golfers, and said display includes means for displaying at least one of said identification codes at any particular time.

**29.** A portable distance tracking system according to claim 8 wherein said memory includes means for storing information regarding at least one round of golf on said particular golf course, said keyboard includes means for signaling said processor to recall said information from said memory, and said display includes mean for displaying said information, wherein said information includes at least one of total score, score on particular holes, clubs selected for particular shots, penalties taken on particular holes, and distances hit with particular golf clubs.

**30.** A portable distance tracking system according to claim 8 wherein said mobile interface unit includes a communications interface having means for transferring digital information to and from said memory, wherein said system further includes a central computer including means for interfacing with said communication interface to transfer digital information between said mobile interface unit and said central computer.

**31.** A portable distance tracking system according to claim 30 wherein said central computer includes means for updating said digitized map information stored in said mobile interface unit memory to reflect current golf course conditions.

**32.** A portable distance tracking system according to claim 30 wherein said mobile interface unit memory includes means for storing information regarding at least one round of golf on said golf course, said key-

18

board includes means for signaling said processor to recall said information from said memory, and said display includes means for displaying said information, wherein said information includes at least one of total score, score on particular holes, clubs selected for particular shots, penalties taken on particular holes, putts taken on particular holes, and distances hit with particular golf clubs, and said central computer includes means for downloading said information, means for processing said information, means for storing said information, and means for printing said information in at least one of processed or unprocessed form.

**33.** A system for determining the distance between a first location and a second location on a particular hole on a golf course, comprising:

(A) GPS receiver means, positioned at said first location, for receiving a global earth position of said first location;

(B) a memory element having means for storing digitized map representations of a plurality of holes on a golf course; and

(C) processing means in communication with said GPS receiver means, comprising

i) means for correlating said global earth position with said digitized map representations to automatically identify said particular hole on said golf course, and

ii) means for correlating said first location to said second location to determine from said first location to said second location.

**34.** A system according to claim 33 further comprising indication means for indicating said distance to a user of said system.

**35.** A system according to claim 34 wherein said indication means is a liquid crystal display.

**36.** A system according to claim 33 wherein said GPS receiver means is a differential GPS receiver having means for receiving and applying a correction signal, and further comprising stationary differential GPS receiver/transmitter means for operating in conjunction with, and transmitting said correction signal to, said differential GPS receiver means and being positioned at a known global earth location geographically located with respect to said golf course.

**37.** A system according to claim 33 wherein said processing means further comprises memory load means for communicating coordinates representative of at least one location of said golf course to said memory means.

**38.** A system according to claim 37 further comprising local memory storage means for storing coordinates representative of said golf course, said memory load means being in selective communication with said local memory storage means wherein said memory load means communicates said coordinates representative of said golf course to said memory means for storage in said memory means.

**39.** A system according to claim 33 wherein said memory element includes means for storing digitized map representations of a plurality of golf courses and said system includes means for correlating said global earth position with said digitized map representations of said plurality of golf courses to automatically identify a particular golf course that a golfer has selected to play.

**40.** A system according to claim 33 wherein said system includes a visual display for displaying at least a portion of a particular hole that a golfer has selected to play on said particular golf course, and means for dy-

**5,438,518**

19

namically updating said displayed portion of said particular hole in dependence on said first location.

41. A method for determining the distance between a first location and a second location on a particular hole on a golf course, comprising:

(A) receiving a global earth position at a mobile interface unit at a first location from a GPS constellation;

(B) storing in said mobile interface unit digitized map representations of a plurality of holes on a golf course; and

(C) processing in said mobile interface unit said global earth position and said digitized map representations by

i) correlating said global earth position with said digitized map representations to automatically identify said particular hole on said golf course, and

20

ii) correlating said first location to said second location to determine the distance from said first location to said second location.

42. A method according to claim 41 comprising the further steps of

(A) storing digitized map representations of a plurality of golf courses; and

(B) correlating said global earth position with said digitized map representations of said plurality of golf courses to automatically identify a particular golf course that said golfer has selected to play.

43. A method according to claim 41 comprising the further steps of

(A) displaying at said mobile interface unit a representation of at least a portion of said particular hole; and

(B) dynamically updating said portion of said particular hole being displayed in dependence on changing said first location of said mobile interface unit.

* * * * *

08CV4028
JUDGE KENDALL
MAGISTRATE JUDGE COX

PH

# EXHIBIT C

# PATENT ASSIGNMENT

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | SECURITY AGREEMENT |

## CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| Prolink Solutions, LLC | 06/30/2006 |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Comerica Bank |
| Street Address: | One North Central Avenue, Suite 1000 |
| City: | Phoenix |
| State/Country: | ARIZONA |
| Postal Code: | 85004 |

## PROPERTY NUMBERS Total: 11

| Property Type | Number |
|---|---|
| Patent Number: | 5689431 |
| Patent Number: | D394637 |
| Patent Number: | 5878369 |
| Patent Number: | 5873797 |
| Patent Number: | 6024655 |
| Patent Number: | 6236940 |
| Patent Number: | 6236360 |
| Patent Number: | 6446005 |
| Patent Number: | 6470242 |
| Patent Number: | 6525690 |
| Patent Number: | 5438518 |

## CORRESPONDENCE DATA

Fax Number:        (602)382-6070

*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*

Phone:        602-382-6228

500122855

**PATENT
REEL: 017882 FRAME: 0210**

| Email: | hsobelman@swlaw.com |
|---|---|
| Correspondent Name: | Howard Sobelman, Snell & Wilmer L.L.P. |
| Address Line 1: | One Arizona Center, 400 E. Van Buren |
| Address Line 4: | Phoenix, ARIZONA 85004-2202 |

| ATTORNEY DOCKET NUMBER: | 41529.0062 |
|---|---|

| NAME OF SUBMITTER: | Howard Sobelman |
|---|---|

Total Attachments: 12
source=prolink#page1.tif
source=prolink#page2.tif
source=prolink#page3.tif
source=prolink#page4.tif
source=prolink#page5.tif
source=prolink#page6.tif
source=prolink#page7.tif
source=prolink#page8.tif
source=prolink#page9.tif
source=prolink#page10.tif
source=prolink#page11.tif
source=prolink#page12.tif

# INTELLECTUAL PROPERTY SECURITY AGREEMENT

This Intellectual Property Security Agreement (this "Agreement") is made as of June 30, 2006, by PROLINK SOLUTIONS, LLC, a Delaware limited liability company ("Debtor"), in favor of COMERICA BANK ("Secured Party").

## RECITALS

A.    Secured Party has lent to Debtor certain amounts (the "Loan"), as more fully described in that certain Loan and Security Agreement by and among Debtor, PROLINK HOLDINGS CORP., a Delaware corporation and Secured Party, dated as of June 30, 2006 (as amended from time to time, the "Loan Agreement").

B.    One of the conditions to Secured Party's obligations to make the Loan was Debtor's grant to Secured Party of a security interest in the "Intellectual Property Collateral," as defined in Section 2, to secure Debtor's obligations to Secured Party.

C.    To induce Secured Party to continue to advance the Loan pursuant to the terms of the Loan Agreement, Debtor has agreed to enter into this Agreement.

## AGREEMENTS

I.    Definitions.   The following terms not otherwise defined herein will have the meanings indicated:

a.    "Copyrights" means copyrights, registrations and applications therefor, and any and all (i) renewals and extensions thereof, (ii) income, royalties, damages and payments now and hereafter due or payable with respect thereto, including damages and payments for past or future infringements thereof, (iii) rights to sue for past, present and future infringements thereof, and (iv) all other rights corresponding thereto throughout the world.

b.    "Licenses" means license agreements in which a party grants or receives a grant of any interest in Copyrights, Trademarks, Patents and Trade Secrets and other intellectual property and any and all (i) renewals, extensions, supplements, amendments and continuations thereof, (ii) income, royalties, damages and payments now and hereafter due or payable to the party with respect thereto, including damages and payments for past or future violations or infringements or misappropriations thereof, and (iii) rights to sue for past, present and future violations or infringements thereof.

c.    "Patents" means patents and patent applications along with any and all (i) inventions and improvements described and claimed therein, (ii) reissues, reexaminations, divisions, continuations, renewals, extensions and continuations-in-part thereof, (iii) income, royalties, damages and payments now and hereafter due and/or payable to the holder with respect thereto, including damages and payments for past or future infringements thereof, (iv) rights to sue for past, present and future infringements thereof, and (v) all other rights corresponding thereto throughout the world.

d.    "Trademarks" means trademarks (including service marks and trade names, whether registered or at common law), registrations and applications therefor, and the entire product lines and goodwill of the owner's business connected therewith and symbolized thereby, together with any and all (i) renewals thereof, (ii) income, royalties, damages and payments now and hereafter due or payable with respect thereto, including damages and payments for past or future infringements thereof, (iii) rights to sue for past, present and future infringements or misappropriations thereof, and (iv) all other rights corresponding thereto throughout the world.

e.    "Trade Secrets" means trade secrets, along with any and all (i) income, royalties, damages and payments now and hereafter due and/or payable to the owner with respect thereto, including damages and payments for past or future infringements or misappropriations thereof, (ii) rights to sue for past, present and future infringements or misappropriations thereof, and (iii) all other rights corresponding thereto throughout the world.

2.    Grant of Security Interest.    Debtor hereby grants to Secured Party a security interest in the following described intellectual property (collectively, the "Intellectual Property Collateral"):

a.    All Trademarks of Debtor now owned or hereafter acquired, including those Trademarks listed on Exhibit A hereto.

b.    All Copyrights of Debtor, now owned or hereafter acquired, including those registered Copyrights listed on Exhibit B hereto.

c.    All Patents of Debtor, now owned or hereafter acquired, including those Patents listed on Exhibit C hereto.

d.    All Trade Secrets of Debtor, now owned or hereafter acquired.

e.    All Licenses of Debtor, now owned or hereafter acquired.

f.    All files and records of Debtor or in which Debtor has any interest and supporting evidence and documents relating to the Intellectual Property Collateral, including computer programs, disks, tapes and related electronic data processing media, all rights of Debtor to retrieval from third parties of electronically processed and recorded information, and all payment records, correspondence, license agreements and the like, together with all Debtor's books of account ledgers, cabinets and equipment in which the same are reflected or maintained, now owned or hereafter acquired.

g.    All proceeds of the foregoing.

3.    Secured Indebtedness.    The Intellectual Property Collateral secures and will secure all Indebtedness of Debtor to Secured Party related to the Loan.  For purposes of this Agreement, "Indebtedness" will mean all loans and advances made by Secured Party to Debtor pursuant to the Loan Agreement, including related interest, loan fees, charges, attorneys' fees and other expenses for which Debtor is obligated, all guaranties by Debtor in favor of Secured Party related to the Loan, whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether due or not due, whether absolute or contingent, or whether

PATENT
REEL: 017882 FRAME: 0213

incurred directly or acquired by Secured Party by assignment or otherwise. Without limiting the generality of the foregoing, "Indebtedness" includes all obligations of Debtor to Secured Party under the Note (as defined in the Loan Agreement), including all renewals and modifications thereof.

4.    <u>Representations and Warranties of Debtor</u>. Debtor represents and warrants that:

a.    Debtor is the sole owner of the Intellectual Property Collateral, except for licenses granted by Debtor to its customers in the ordinary course of business. To the best of Debtor's knowledge, each of the Patents, if any, is valid and enforceable, and no part of the Intellectual Property Collateral has been adjudged invalid or unenforceable, in whole or in part, and no claim has been made that any part of the Intellectual Property Collateral violates the rights of any third party.

b.    Debtor is and will be and remain the sole and exclusive owner of the Intellectual Property Collateral, except for licenses granted by Debtor to its customers in the ordinary course of business, all of which is and will be free and clear of any liens, charges and encumbrances, except those in favor of Secured Party or to which Secured Party has consented in writing.

c.    To the best of   Debtor's knowledge, Debtor's use of   the Tradenames, Trademarks, Copyrights, Patents, and Licenses does not conflict with the rights of others.

d.    Except as disclosed to Secured Party in connection with the Loan Agreement, there are no material claims, judgments or settlements to be paid by Debtor or pending claims or litigation relating to the Intellectual Property Collateral.

e.    No effective security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Intellectual Property Collateral is on file or of record in any public office, except such as may have been filed by Debtor in favor of Secured Party.

5.    <u>Covenants of Debtor</u>. Debtor agrees that:

a.    Debtor will take such actions as shall be commercially reasonable to protect the marks, inventions and works of authorship identified on Exhibits A, B and C, as well as any subsequent marks, inventions and works of authorship which are security for the Loan and the failure to do so would have a material adverse effect on the financial condition or operations of Debtor.

b.    Debtor shall execute and deliver such additional instruments and documents from time to time as Secured Party shall reasonably request to perfect Secured Party's security interest in any Intellectual Property Collateral issued and/or registered after the date of this Agreement.

c.    Debtor shall use commercially reasonable efforts to prosecute and maintain the validity and enforceability of the Trademarks, Patents and Copyrights and use commercially reasonable efforts to detect infringements of the Trademarks, Patents and Copyrights and promptly advise Secured Party in writing of material infringements detected. Debtor shall not

**PATENT**
**REEL: 017882 FRAME: 0214**

allow any Trademarks, Patents or Copyrights to be abandoned, forfeited or dedicated to the public without the written acknowledgment of Secured Party unless such Trademarks, Patents or Copyrights are no longer necessary for the operation of Debtor's business.

d.    Secured Party may audit Debtor's Intellectual Property Collateral to confirm compliance with this Section 5, provided such audit may not occur more often than once per year, unless an Event of Default has occurred and is continuing.

6.    Further Understandings.  Debtor's rights as to the Intellectual Property Collateral are subject to the following further understandings:

a.    Prior to the occurrence of an Event of Default hereunder Debtor may continue to exploit, license, franchise, use, enjoy and protect (whether in the United States of America or any foreign jurisdiction) the Intellectual Property Collateral in the ordinary course of business and in a manner consistent with the preservation of Secured Party's rights hereunder, and Secured Party will execute and deliver, at Debtor's sole cost and expense, any and all instruments, certificates or other documents reasonably requested by Debtor to enable Debtor to do so.

b.    This Agreement, and the security interest created hereunder, will terminate when all Indebtedness has been fully paid and satisfied.  Secured Party (without recourse upon, or any warranty whatsoever by, Secured Party) will then execute and deliver to Debtor such documents and instruments evidencing the termination of the security interest hereunder as Debtor may reasonably request.

c.    Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact, with full authority in the place and stead of Debtor and in the name of Debtor, from time to time in Secured party's discretion, to take any action and to execute any instrument which Secured party may deem necessary or advisable to accomplish the purposes of this Agreement, including (i) to modify, in its sole discretion, this Agreement without first obtaining Debtor's approval of or signature to such modification by amending any Exhibit hereto to include reference to any Intellectual Property Collateral acquired by Debtor after the execution thereof or to delete any reference to any Intellectual Property Collateral in which Secured Party no longer has or claims any interest and (ii) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto relative to any of the Intellectual Property Collateral without the signature of Debtor, where permitted by law.

7.    Default.  The occurrence of an "Event of Default" under the Loan Agreement shall be an Event of Default hereunder.

8.    Secured Party's Remedies After Default.  Upon the occurrence of an Event of Default and subject to the notice and cure rights provided in the Loan Agreement, Secured Party may take any one or more of the following actions, all without notice (except as provided in the Loan Agreement), demand, legal process, protest or presentment of any kind:

a.    Declare any or all Indebtedness immediately due and payable, without notice or demand.

PATENT
REEL: 017882 FRAME: 0215

b.    Exercise any and all rights and powers of the Debtor respecting the Intellectual Property Collateral.

c.    Sell or assign or grant a license or franchise to use, or cause to be sold or assigned or granted a license or franchise to use, any or all of the Intellectual Property Collateral, in each case, free of all rights and claims of Debtor therein and thereto (but subject, in each case, to the rights of others heretofore granted or created by Debtor as contemplated herein).

d.    Exercise the rights and remedies of a secured party under the Arizona Commercial Code or any other applicable law, including selling the Intellectual Property Collateral at public or private sale, for cash or on credit, in whole or in part and on such terms as Secured Party may determine.

e.    Require Debtor to assemble any tangible Intellectual Property Collateral and make such Intellectual Property Collateral available to Secured Party at a place designated by Secured Party or to deliver a copy to Secured Party of any such Intellectual Property Collateral consisting of books, records, computer disks, tapes and the like.

f.    Enter the premises of Debtor or third parties in order to take possession of any tangible Intellectual Property Collateral.

g.    Require Debtor to segregate all collections and proceeds of the Intellectual Property Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

h.    Notify any obligated persons of Secured Party's interest in the Intellectual Property Collateral and the proceeds thereof and require any such persons to forward all remittances, payments and proceeds respecting the Intellectual Property Collateral to Secured Party or a post office box under Secured Party's exclusive control.

i.    Demand and collect any proceeds of the Intellectual Property Collateral.

j.    Bring suit in its own or Debtor's name to protect or enforce Debtor's rights respecting any Intellectual Property Collateral, in which case Debtor will do any and all lawful acts and execute any and all proper documents requested by Secured Party in connection with such action.

k.    Grant extensions of time for payment of amounts due respecting any Intellectual Property Collateral and compromise or settle claims or disputes of any customer of Debtor or any third party relating to any Intellectual Property Collateral, including compromises and settlements that are for less than the full amount due or involve discounts, credits or allowances other than in the ordinary course of business, all as Secured Party in good faith deems advisable or appropriate and without prior notice to or consent of Debtor.

l.    Use any Intellectual Property Collateral in connection with any assembly, use or disposition of other collateral in which Debtor has granted a security interest to Secured Party under the Loan Agreement.

**PATENT**
**REEL: 017882 FRAME: 0216**

m.     Take such measures as Secured Party may deem reasonably necessary or advisable to preserve, maintain, protect or develop the Intellectual Property Collateral or any portion thereof or to perform such obligations hereunder as Debtor may have failed to perform without curing Debtor's default arising from such failure.

n.     Apply to any court of competent jurisdiction for appointment of a receiver to enforce any of Secured Party's remedies with respect to the Intellectual Property Collateral to which appointment Debtor hereby consents.

o.     Apply all recoveries received by Secured Party pursuant to the exercise of Secured party's rights hereunder, net of all Secured Party's related cots and expenses, to the Indebtedness with Debtor remaining liable for any deficiency.

p.     Demand Debtor's payment of all Secured Party's costs and expenses incurred in connection with the exercise by Secured Party of its rights hereunder not offset against recoveries as provided in paragraph 8. hereinabove.

q.     Institute proceedings to enforce Secured Party's rights to any amounts owed by Debtor hereunder.

r.     Exercise such further remedies as Secured Party may have at law or in equity.

9.     <u>Miscellaneous</u>.

a.     Except for the gross negligence or willful misconduct of Secured Party, Secured Party will have no liability for any handling or mishandling of any check, note, acceptance or other instrument which the maker thereof tenders to Debtor or Secured Party in connection with the Intellectual Property Collateral.

b.     All representations, warranties, covenants, agreements, terms and conditions made herein will survive the execution, delivery and closing of this Agreement and all transactions contemplated hereby.

c.     No failure or delay on the part of Secured Party in the exercise of any power, right or privilege hereunder or to insist on strict compliance or performance of the representations, warranties, covenants, agreements, terms and conditions of this Agreement will operate as a waiver thereof.

d.     Time and exactitude of each of the terms, obligations, covenants and conditions are hereby declared to be of the essence hereof

e.     This Agreement will be governed by and construed according to the laws of the State of Arizona.

f.     All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Such rights and remedies may be exercised singularly or collectively from time to time, and thus any single or partial exercise of any right or remedy will not preclude the further exercise thereof or the exercise of any other right or remedy.

**PATENT**
**REEL: 017882 FRAME: 0217**

g.    The defined terms in this Agreement will apply equally to both the singular and the plural forms of the terms defined.    Whenever the context may require, any pronoun will include the corresponding masculine, feminine and neuter forms.    The words "include," "includes" and "including" when used in this Agreement will be deemed to be followed by the phrase "without limitation."

h.    In the event of any action or proceeding that involves the protection, preservation or enforcement of Secured Party's rights or Debtor's obligations relating to this Agreement or the Indebtedness, Secured Party will be entitled to reimbursement from Debtor of all costs and expenses associated with said action or proceeding, including reasonable attorneys' fees and litigation expenses.    Debtor will reimburse Secured Party for all reasonable attorneys' fees and expenses incurred in the representation of Secured Party in any aspect of any bankruptcy or insolvency proceeding initiated by or on behalf of Debtor that concerns any of Debtor's obligations to Secured Party under this Agreement, the Indebtedness or otherwise.    In the event of a judgment against one party concerning any aspect of this Agreement or the Indebtedness, the right to recover post-judgment attorneys' fees incurred in enforcing the judgment will not be merged into and extinguished by any money judgment.    The provisions of this paragraph constitute a distinct and severable agreement from the other contractual rights created by this Agreement or the Indebtedness.

i.    Debtor hereby waives diligence, presentment, protest and demand and notice of every kind (except for such notice provided for under the Loan Agreement) and, to the extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.    Debtor further waives any right to require Secured Party to proceed against any person for payment of the Indebtedness or against any other security Secured Party may have for the Indebtedness as a condition to realizing upon any Intellectual Property Collateral hereunder.

j.    If any provisions of this Security Agreement are held to be invalid, illegal, unenforceable or against public policy in any respect, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

k.    Debtor will indemnify, defend and hold Secured Party harmless from and against any claims, losses, damages, suits, costs and expenses incurred by or asserted against Secured Party arising out of this Agreement, including Secured Party's enforcement of its rights hereunder, except where the covered matter results from Secured Party's gross negligence or willful misconduct.

10.    This Agreement will inure to the benefit of Secured Party and its successors and assigns. Debtor will not assign any of Debtor's rights, duties or obligations hereunder. Any such assignment by Debtor will be void and of no effect as to Secured Party and its successors or assigns.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**PATENT
REEL: 017882 FRAME: 0218**

Executed as of June 30, 2006, at Phoenix, Arizona.

PROLINK SOLUTIONS, LLC, a Delaware limited
liability company

By: _____

Name: Barry Sullivan

Title: Chief Financial Officer

Address:        410 S. Benson Lane
                Chandler, Arizona 85224

Sworn and subscribed before me this ____ day of _____, 2006.

_____
Notary Public

My Commission expires on:

_____

OFFICIAL SEAL
BETTY LINCK
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Sept. 4, 2009

**PATENT**
**REEL: 017882 FRAME: 0219**

EXHIBIT A

TRADEMARKS

NONE

PATENT
REEL: 017882 FRAME: 0220

EXHIBIT B

COPYRIGHTS

NONE

99999.0000\Carrold\PHX\1853356

EXHIBIT C

PATENTS

| Patent No. and Issue Date | Short Title | Summary |
|---|---|---|
| *Patent #* 5,689,431 *Issued* 11/18/97 | Golf Course Yardage and Information System Digital Mapping | Method for creating a digital map of a golf course including tee box, fairway, green, cup and selected features, using a position determining system to collect survey data points by traversing the perimeter of each hole and features relative to a pre-selected arbitrary reference point. Provides a realistic approximation of the entire course including essential details of each hole. |
| *Patent #* D394,637 *Issued* 05/26/98 | Golf Cart Roof | Covers design of golf cart roof incorporating a monitor. |
| *Patent #* 5,878,369 *Issued* 03/02/99 | Golf Course Yardage and Information Broadcast Transmission System | Broadcast transmission system for determining location of a multiplicity of dispersed vehicles/objects in transit, managing each of their respective dispositions, with a base station and plural remote stations associated with the objects while in transit. |
| *Patent #* 5,873,797 *Issued* 02/23/99 | Remote Golf Ball Locator | Covers a method for indicating distance from a golf ball in play, rather than from a cart. The method includes displaying a depiction of the golf ball along a line running length of the hole from tee box to green and parallel to a side boundary of hole to approximate the lie of an actual golf ball in play and to display approximate distance from the ball rather than the cart. |

PATENT
REEL: 017882 FRAME: 0222

| | | |
|---|---|---|
| *Patent #* 6,024,655 *Issued* 02/15/00 | Map-Matching Golf Navigation System | Apparatus and method for calibrating a cart navigation system for a golf course position and yardage measurement system, using map matching. |
| *Patent #* 6,236,940 *Issued* 05/22/01 | Roof Mounted Color Screen | Navigation System cover roof-mounted monitor including features of mounting on underside of cart roof for shading/ease of viewing in sunlight; graphical user interface for window display on monitor; screen canted back to reduce reflections; diffuse or black coating on underside of roof to reduce reflectivity; images displayed in color, with features on map of hole in distinctive colors for realistic display. |
| *Patent #* 6,236,360 *Issued* 05/22/01 | Golf Course Yardage and Information System with Zone Detection | A player position determining and course management system for a golf course having a plurality of roving units for use by players playing the course. |
| *Patent #* 6,446,005 *Issued* 09/03/02 | Magnetic Wheel Sensor for Vehicle Navigation System | A method of determining the precise location of golf carts on a golf course in real time as the carts are in use using a dead reckoning navigation (DNR) system for determining speed and direction. |
| *Patent #* 6,470,242 *Issued* 10/22/02 | Expanded claims for patents D394,637 and 6,236,940 | Display Monitor for Golf Cart Yardage and Information System. This patent has additional (broader) claims for the heads up display including means for improved viewing of the screen in sunlight. |
| *Patent #* 6,525,690 *Issued* 02/25/03 | Expanded claims for patent 6,236,360 | Golf Course Yardage and Information System with Zone Detection. This patent has additional (broader) claims for zone detection including golf course features other than the tee box and green. |
| *Patent #* 5,438,518 *Issued* 08/01/1995 | Player Positioning and Distance Finding System | Portable distance tracking system for use by a player on a playing field. - Licensed from ParView in perpetuity on an exclusive basis |

RECORDED: 07/06/2006

PATENT
REEL: 017882 FRAME: 0223

```
08CV4028
JUDGE KENDALL
MAGISTRATE JUDGE COX

PH
```

# EXHIBIT D

# PATENT ASSIGNMENT

Electronic Version v1.1
Stylesheet Version v1.1

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | Intellectual Property Security Agreement |

## CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| Prolink Solutions, LLC | 08/17/2007 |
| Prolink Holdings Corp. | 08/17/2007 |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Calliope Capital Corporation |
| Street Address: | 335 Madison Ave., 10th Floor |
| Internal Address: | c/o Laurus Capital Management, LLC |
| City: | New York |
| State/Country: | NEW YORK |
| Postal Code: | 10017 |

## PROPERTY NUMBERS Total: 13

| Property Type | Number |
|---|---|
| Patent Number: | 7031947 |
| Patent Number: | 6525690 |
| Patent Number: | 6470242 |
| Patent Number: | 6446005 |
| Patent Number: | 6236940 |
| Patent Number: | 6236360 |
| Patent Number: | 6024655 |
| Patent Number: | 5878369 |
| Patent Number: | 5873797 |
| Patent Number: | 5689431 |
| Patent Number: | 5438518 |
| Application Number: | 11406833 |
| Patent Number: | D394637 |

CH $520.00    7031947

**PATENT**

CORRESPONDENCE DATA

| | |
|---|---|
| Fax Number: | (202)756-9299 |

*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*

| | |
|---|---|
| Phone: | 8002210770 |
| Email: | matthew.mayer@thomson.com |
| Correspondent Name: | Corporation Service Company |
| Address Line 1: | 1133 Avenue of the Americas |
| Address Line 2: | Suite 3100 |
| Address Line 4: | New York, NEW YORK 10036 |

| ATTORNEY DOCKET NUMBER: | CSC # 062688 |
|---|---|
| NAME OF SUBMITTER: | Matthew Mayer |

Total Attachments: 16
source=prolink2_calliope_pat13#page2.tif
source=prolink2_calliope_pat13#page3.tif
source=prolink2_calliope_pat13#page4.tif
source=prolink2_calliope_pat13#page5.tif
source=prolink2_calliope_pat13#page6.tif
source=prolink2_calliope_pat13#page7.tif
source=prolink2_calliope_pat13#page8.tif
source=prolink2_calliope_pat13#page9.tif
source=prolink2_calliope_pat13#page10.tif
source=prolink2_calliope_pat13#page11.tif
source=prolink2_calliope_pat13#page12.tif
source=prolink2_calliope_pat13#page13.tif
source=prolink2_calliope_pat13#page14.tif
source=prolink2_calliope_pat13#page15.tif
source=prolink2_calliope_pat13#page16.tif
source=prolink2_calliope_pat13#page17.tif

## INTELLECTUAL PROPERTY SECURITY AGREEMENT

THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT (this "Agreement"), dated as of August 17, 2007, is made by PROLINK SOLUTIONS, LLC, a Delaware limited liability company ("ProLink Solutions"), and PROLINK HOLDINGS CORP., a Delaware corporation ("ProLink Holdings" together with ProLink Solutions, each a "Grantor" and collectively, the "Grantors"), in favor of CALLIOPE CAPITAL CORPORATION ("Calliope").

WHEREAS, pursuant to that certain Security Agreement dated as of the date hereof by and among Grantors, other subsidiaries of the Grantors which may hereafter become a party thereto and Calliope (as from time to time amended, restated, supplemented and/or otherwise modified, the "Security Agreement"), Calliope has agreed to provide financial accommodations to the Grantors;

WHEREAS, Calliope is willing to enter into the Security Agreement, but only upon the condition, among others, that the Grantors shall have executed and delivered to Calliope this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantors hereby agrees as follows:

Section 1    DEFINED TERMS.

    (a)    When used herein the following terms shall have the following meanings:

"Copyrights" means all works capable of copyright under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office, and the right to obtain all renewals of any of the foregoing.

"Copyright Licenses" means all written agreements relating to any Copyright, including agreements providing the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright, and whether any Grantor is named as licensor, licensee or otherwise.

"General Intangibles" shall have the meaning provided thereto in Section 9-102 of the UCC, as amended, restated or otherwise modified from time to time.

"IP Licenses" shall mean Copyright Licenses, Patent Licenses and Trademark Licenses.

"Obligations" has the meaning given to the term in the Security Agreement.

"Patents" means (a) all letters patent of the United States, any other country or any political subdivision thereof, and all reissues and extensions of such letters patent, (b) all applications for letters patent of the United States or any other county and all divisions,

**PATENT
REEL: 019733 FRAME: 0519**

continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"Patent Licenses" means all agreements, whether written or oral, relating to any Patent, including agreements providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent, and whether any Grantor is named as licensor, licensee or otherwise.

"Trademarks" means (a) all trademarks, trade names, corporate names, business names, fictitious business names, trade styles, services marks, logos, domain names and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or political subdivision thereof, or otherwise, and all common-law rights thereto, and (b) the right to obtain all renewals thereof.

"Trademark Licenses" means, collectively, each agreement, whether written or oral, relating to any Trademark, including agreements providing for the grant by or to any Grantor of any right to use any Trademark, and whether any Grantor is named as licensor, licensee or otherwise.

"UCC" has the meaning given to the term in the Security Agreement.

(b)    All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement.

Section 2    GRANT OF SECURITY INTEREST IN INTELLECTUAL PROPERTY COLLATERAL.  To secure the complete and timely payment of all the Obligations of the Grantors now or hereafter existing from time to time, each Grantor hereby grants to Calliope a continuing first priority security interest in all of such Grantor's right, title and interest in, to and under the following, whether presently existing or hereafter created or acquired (collectively, the "Collateral"):

(a)    all of its Patents and Patent Licenses to which it is a party including those referred to on Schedule I hereto;

(b)    all of its Trademarks and Trademark Licenses to which it is a party including those referred to on Schedule II hereto;

(c)    all of its Copyrights and Copyright Licenses to which it is a party including those referred to on Schedule III hereto;

(d)    all renewals, reissues, continuations or extensions of the foregoing;

(e)    all goodwill of the business connected with the use of, and symbolized by, each Patent, each Patent License, each Trademark, each Trademark License, each Copyright and each Copyright License; and

PATENT
REEL: 019733 FRAME: 0520

(f)     all products and proceeds of the foregoing, including, without limitation, any claim by such Grantor against third parties for past, present or future (i) infringement or dilution of any Patent or Patent licensed under any Patent License, (ii) injury to the goodwill associated with any Patent or any Patent licensed under any Patent License, (iii) infringement or dilution of any Trademark or Trademark licensed under any Trademark License, (iv) injury to the goodwill associated with any Trademark or any Trademark licensed under any Trademark License, (v) infringement or dilution of any Copyright or Copyright licensed under any Copyright License, and (vi) injury to the goodwill associated with any Copyright or any Copyright licensed under any Copyright License.

Section 3     <u>REPRESENTATIONS AND WARRANTIES</u>.  Each Grantor represents and warrants that:

(a)     It does not have any interest in, or title to, any Patent, Trademark, Copyright or any IP License, except as set forth in <u>Schedule I</u>, <u>Schedule II</u> and <u>Schedule III</u>, respectively, hereto.

(b)     Except as set forth in <u>Schedule I</u>, <u>Schedule II</u> and <u>Schedule III</u>, it is either the sole owner of the Patents, Trademarks and Copyrights, or has the sole right to use the Patents, Trademarks and Copyrights, free and clear of all liens or other encumbrances.

(c)     Each of the Patents, Trademarks and Copyrights is valid and enforceable, and there is no claim that the use of any of them violates the rights of any third party.

(d)     The IP Licenses are in full force and effect, and no Grantor is in breach or default under any of the IP Licenses.

(e)     This Agreement is effective to create a valid and continuing first priority lien on and perfected security interests in favor of Calliope in all of each Grantor's Patents, Trademarks, Copyrights and IP Licenses and such perfected security interests are enforceable as such as against any and all creditors of, and purchasers from, such Grantor.

(f)     Upon the filing of (i) appropriate financing statements, all action necessary or desirable to protect and perfect Calliope's first priority lien on each Grantor's Patents, Trademarks and IP Licenses shall have been duly taken and (ii) the security interest in the Copyrights with the Copyright Office, all action necessary or desirable to protect and perfect Calliope's first priority lien on each Grantor's Copyrights shall have been duly taken.

Section 4     <u>COVENANTS</u>.  Each Grantor covenants and agrees with Calliope that from and after the date of this Agreement:

(a)     It shall notify Calliope immediately if it knows or has reason to know that any application or registration relating to any Patent, Trademark or Copyright (now or hereafter existing) may become abandoned or dedicated, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States

PATENT
REEL: 019733 FRAME: 0521

Copyright Office or any court) regarding any Grantor's ownership of or right to use any Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same.

(b)    In no event shall any Grantor, either directly or through any agent, employee, licensee or designee, file an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving Calliope prior written notice thereof, and, upon request of Calliope, each Grantor shall execute and deliver a supplement hereto (in form and substance satisfactory to Calliope) to evidence Calliope's lien on such Patent, Trademark or Copyright, and such Grantor's General Intangibles relating thereto or represented thereby.

(c)    It shall take all actions necessary or requested by Calliope to continue to use all Trademarks (and all trademarks owned by a third party and subject to a Trademark License) and maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of the Patents or Trademarks (now or hereafter existing), including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings.

(d)    In the event that any of the Collateral is infringed upon, misappropriated or diluted by a third party, the Grantors shall notify Calliope promptly after any Grantor learns thereof.  Each Grantor shall, unless it shall reasonably determine that such Collateral is in no way material to the conduct of its business or operations, promptly sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as Calliope shall deem appropriate under the circumstances to protect such Collateral.

Section 5    SECURITY AGREEMENT.    The security interests granted pursuant to this Agreement are granted in conjunction with the security interests granted to Calliope by each Grantor pursuant to the Security Agreement.  The Grantors and Calliope hereby acknowledge and affirm that the rights and remedies of Calliope with respect to the security interest in the Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

Section 6    REINSTATEMENT.    This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of such Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be

PATENT
REEL: 019733 FRAME: 0522

reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

Section 7    EXECUTION OF POWER OF ATTORNEY.    Concurrently with the execution and delivery hereof, each Grantor shall execute and deliver to Calliope, in the form of Exhibit A hereto, ten (10) originals of a Power of Attorney for the implementation of the assignment, sale or other disposal of the Collateral pursuant to Calliope's rights and remedies under the Security Agreement.

Section 8    INDEMNIFICATION.    Each Grantor assumes all responsibility and liability arising from the use of the Patents, Trademarks and/or Copyrights and each Grantor hereby indemnifies and holds Calliope harmless from and against any claim, suit, loss, damage or expense (including reasonable attorneys' fees) arising out of any Grantor's operations of its business from the use of the Patents, Trademarks and/or Copyrights.  In any suit, proceeding or action brought by Calliope under any IP License for any sum owing thereunder, or to enforce any provisions of such IP License, each Grantor will indemnify and keep Calliope harmless from and against all expense, loss or damage suffered by reason of any defense, set off, counterclaim, recoupment or reduction or liability whatsoever of the obligee thereunder, arising out of a breach by any Grantor of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such obligee or its successors from any Grantor, and all such obligations of such Grantor shall be and remain enforceable against and only against such Grantor and shall not be enforceable against Calliope.  Grantor shall have no obligations under this Section 8 in the event any claim, suit, loss, damage or expense arises solely from the gross negligence or willful misconduct of Calliope.

Section 9    NOTICES.    Whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give and serve upon any other party any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be given in the manner, and deemed received, as provided for in the Security Agreement.

Section 10    TERMINATION OF THIS AGREEMENT.    Subject to Section 6 hereof, this Agreement shall terminate upon indefeasible payment in full in cash of all Obligations and irrevocable termination of the Security Agreement.

[Signature Page to Follow]

PATENT
REEL: 019733 FRAME: 0523

IN WITNESS WHEREOF, each Grantor has caused this Intellectual Property Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

PROLINK SOLUTIONS, LLC

By: _____
Name:  Lawrence D. Bain
Title:  Chief Executive Officer

PROLINK HOLDINGS CORP.

By: _____
Name:  Lawrence D. Bain
Title:  Chief Executive Officer

ACCEPTED AND ACKNOWLEDGED BY:

CALLIOPE CAPITAL CORPORATION

By:    Laurus Capital Management, LLC,
       as investment manager

By:_____
     Name:
     Title:

SIGNATURE PAGE TO
INTELLECTUAL PROPERTY SECURITY
AGREEMENT

PATENT
REEL: 019733 FRAME: 0524

IN WITNESS WHEREOF, each Grantor has caused this Intellectual Property Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**PROLINK SOLUTIONS, LLC**

By:_____
    Name:
    Title:

**PROLINK HOLDINGS CORP.**

By:_____
    Name:
    Title:

ACCEPTED AND ACKNOWLEDGED BY:

**CALLIOPE CAPITAL CORPORATION**

By:   Laurus Capital Management, LLC,
     as investment manager

By:_____
    Name:   Eugene Grin
    Title:    Principal

**PATENT
REEL: 019733 FRAME: 0525**

STATE OF <u>Arizona</u>      )
                          )  ss:
COUNTY OF <u>Maricopa</u>  )

On the <u>16</u> day of August, 2007, before me personally came <u>Lawrence D. Bain</u> to me known, who being by me duly sworn, did depose and say s/he is the <u>CEO</u> of ProLink Solutions, LLC, the limited liability company described in and which executed the foregoing instrument; and that s/he signed her/his name thereto pursuant to his/her authority under the organizational documents of said company.

Notary Public
My Commission Expires: 4-4-2009

STATE OF <u>Arizona</u>      )
                          )  ss:
COUNTY OF <u>Maricopa</u>  )

On the <u>16</u> day of August, 2007, before me personally came <u>Lawrence D. Bain</u> to me known, who being by me duly sworn, did depose and say s/he is the <u>CEO</u> of ProLink Holdings Corp., the corporation described in and which executed the foregoing instrument; and that s/he signed her/his name thereto pursuant to his/her authority under the organizational documents of said corporation.

Notary Public
My Commission Expires: 4-4-2009

SIGNATURE PAGE TO
INTELLECTUAL PROPERTY SECURITY
AGREEMENT

**PATENT**
**REEL: 019733 FRAME: 0526**

## SCHEDULE I
## TO
## INTELLECTUAL PROPERTY SECURITY AGREEMENT

I.    PATENT REGISTRATIONS

| Owner | Title | Patent # | Issue Date |
|---|---|---|---|
| ProLink Solutions, LLC | Method and apparatus for continuing play with cart-based navigation/information system display | 7031947 | 4/18/06 |
| ProLink Solutions, LLC | Golf course yardage and information system with zone detection | 6525690 | 2/25/03 |
| ProLink Solutions, LLC | Display monitor for golf cart yardage and information system | 6470242 | 10/22/02 |
| ProLink Solutions, LLC | Magnetic wheel sensor for vehicle navigation system | 6446005 | 9/3/02 |
| ProLink Solutions, LLC | Display monitor for golf cart yardage and information system | 6236940 | 5/22/01 |
| ProLink Solutions, LLC | Golf course yardage and information system with zone detection | 6236360 | 5/22/01 |
| ProLink Solutions, LLC | Map-matching golf navigation system | 6024655 | 2/15/00 |
| ProLink Solutions, LLC | Golf course yardage and information system | 5878369 | 3/2/99 |
| ProLink Solutions, LLC | Remote golf ball locator | 5873797 | 2/23/99 |
| ProLink Solutions, LLC | Golf course yardage and information system | 5689431 | 11/18/97 |
| ProLink Solutions, LLC | Player positioning and distance finding system | 5438518 | 8/1/95 |
| ProLink Solutions, LLC | Golf cart roof | D394637 | 5/26/98 |

II.    PATENT APPLICATIONS

| Owner | Title | Application Number | Date Filed |
|---|---|---|---|
| ProLink Solutions, LLC | Allocating Revenue Derived from Use of GPS-equipped Golf Carts | 11/406,833 | |

| Grantor | Patent | Reg. No. | Date | Exclusivity |
|---|---|---|---|---|
| Optimal Golf Solutions, Inc. | United States | 5,364,093 | 11/15/94 | None |
| GPS Industries, Inc. | Austria | EP 617794 | 12/16/2011 For all patents | None |
| | Eire | EP 617794 | | |
| | France | EP 617794 | | |
| | Great Britain | EP 617794 | | |
| | Italy | EP 617794 | | |
| | Netherlands | EP 617794 | | |
| | Portugal | EP 617794 | | |
| | Sweden | EP 617794 | | |
| | Switzerland | EP 617794 | | |
| | Germany | 69228703.5 | | |
| | Spain | ES2132211 | | |

**PATENT
REEL: 019733 FRAME: 0528**

<u>SCHEDULE II</u>
<u>TO</u>
<u>INTELLECTUAL PROPERTY SECURITY AGREEMENT</u>

I.    TRADEMARK REGISTRATIONS

| <u>GRANTOR</u> | <u>REG. NO.</u> | <u>MARK</u> | <u>COUNTRY</u> | <u>REG. DATE</u> |
|---|---|---|---|---|

None

II.    TRADEMARK APPLICATIONS

| <u>GRANTOR</u> | <u>SER. NO.</u> | <u>MARK</u> | <u>COUNTRY</u> | <u>FILING DATE</u> |
|---|---|---|---|---|

None

III.    TRADEMARK LICENSES

None

LA1669446.4
203891-10014

**PATENT**
**REEL: 019733 FRAME: 0529**

## SCHEDULE III
### TO
### INTELLECTUAL PROPERTY SECURITY AGREEMENT

I.    COPYRIGHT REGISTRATIONS

None

II.    COPYRIGHT APPLICATIONS

None

III.    COPYRIGHT LICENSES

None

**PATENT
REEL: 019733 FRAME: 0530**

## EXHIBIT A

## SPECIAL POWER OF ATTORNEY

STATE OF NEW YORK   )
                          )  ss:
COUNTY OF NEW YORK )

      KNOW ALL MEN BY THESE PRESENTS, that ProLink Solutions, LLC, a limited liability company formed under the laws of Delaware, with its principal office at 410 S. Benson Lane, Chandler, Arizona 85224 ("Company"), pursuant to an Intellectual Property Security Agreement dated as of August ___, 2007 (as amended, modified, restated and/or supplemented from time to time, the "Agreement"), hereby appoints and constitutes Calliope Capital Corporation, with offices at c/o Laurus Capital Management, LLC, 825 Third Avenue 17th Floor, New York, New York 10022 ("Calliope"), its true and lawful attorney, with full power of substitution, and with full power and authority to perform the following acts on behalf of Company:

    I.    Assigning, selling or otherwise disposing of all right, title and interest of Company in and to the Patents and Patent Licenses listed on Schedule I of the Agreement, the Patents and Patent Licenses which are added to the same subsequent hereto, and all registrations and recordings thereof, and all pending applications therefor, recording, registering and filing of, or accomplishing any other formality with respect to the foregoing, and executing and delivering any and all agreements, documents, instruments of assignment or other papers necessary or advisable to effect such purpose; and

    II.   Executing any and all documents, statements, certificates or other papers necessary or advisable in order to obtain the purposes described above as Calliope may in its sole discretion determine.

      This power of attorney is made pursuant to the Agreement and may not be revoked until the payment in full of all Obligations (as defined in the Agreement) and the irrevocable termination of the Agreement.

Dated: August ___, 2007

                PROLINK SOLUTIONS, LLC

                By:_____
                Name:
                Title:

POWER OF ATTORNEY - PATENTS

**PATENT
REEL: 019733 FRAME: 0531**

STATE OF _____    )
                          )   ss:
COUNTY OF _____    )

       On    the    ___    day    of    August,    2007,    before    me    personally    came _____ to me known, who being by me duly sworn, did depose and say s/he is the _____ of ProLink Solutions, LLC, the limited liability company described in and which executed the foregoing instrument; and that s/he signed her/his name thereto in accordance with his/her authority as granted by the organizational documents of such company.

                            _____

                            Notary Public
                            My Commission Expires:

POWER OF ATTORNEY - PATENTS

**PATENT
REEL: 019733 FRAME: 0532**

<u>SCHEDULE I</u>

I.    PATENT REGISTRATIONS

| <u>Owner</u> | <u>Title</u> | <u>Patent #</u> | <u>Issue Date</u> |
|---|---|---|---|
| ProLink Solutions, LLC | Method and apparatus for continuing play with cart-based navigation/information system display | 7031947 | 4/18/06 |
| ProLink Solutions, LLC | Golf course yardage and information system with zone detection | 6525690 | 2/25/03 |
| ProLink Solutions, LLC | Display monitor for golf cart yardage and information system | 6470242 | 10/22/02 |
| ProLink Solutions, LLC | Magnetic wheel sensor for vehicle navigation system | 6446005 | 9/3/02 |
| ProLink Solutions, LLC | Display monitor for golf cart yardage and information system | 6236940 | 5/22/01 |
| ProLink Solutions, LLC | Golf course yardage and information system with zone detection | 6236360 | 5/22/01 |
| ProLink Solutions, LLC | Map-matching golf navigation system | 6024655 | 2/15/00 |
| ProLink Solutions, LLC | Golf course yardage and information system | 5878369 | 3/2/99 |
| ProLink Solutions, LLC | Remote golf ball locator | 5873797 | 2/23/99 |
| ProLink Solutions, LLC | Golf course yardage and information system | 5689431 | 11/18/97 |
| ProLink Solutions, LLC | Player positioning and distance finding system | 5438518 | 8/1/95 |
| ProLink Solutions, LLC | Golf cart roof | D394637 | 5/26/98 |

II.    PATENT APPLICATIONS

| Owner | Title | Application Number | Date Filed |
|-------|-------|--------------------|------------|
| ProLink Solutions, LLC | Allocating Revenue Derived from Use of GPS-equipped Golf Carts | 11/406,833 | |

III.    PATENT LICENSES

| Grantor | Patent | Reg. No. | Date | Exclusivity | Type of License |
|---------|--------|----------|------|-------------|-----------------|

LA1669446.4
203891-10014

**PATENT**
**REEL: 019733 FRAME: 0534**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| GPS INDUSTRIES, INC., a Nevada corporation, and GPS IT, LLC, a Nevada limited liability company,<br><br>      Plaintiffs,<br><br>v.<br><br>PROLINK SOLUTIONS, LLC, a Delaware limited liability company, PROLINK HOLDINGS CORP., a Delaware corporation, LINKSCORP, INC., a Delaware corporation, and ABC NATIONAL TELEVISION SALES, INC., a Delaware corporation<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. <u>FILED: JULY 16, 2008</u><br><u>08CV4028</u><br><br>The Honorable <u>JUDGE KENDALL</u><br><u>MAGISTRATE JUDGE COX</u><br>Magistrate Judge <u>         </u><br><br>    PH<br><br><br>**JURY TRIAL DEMANDED** |

### INDEX OF EXHIBITS

**DESCRIPTION:**                                                                 **EXHIBIT NO.**

U.S. Patent No. 5,685,786......................................................................................A

U.S. Patent No. 5,438,518.......................................................................................B

June 30, 2006 Intellectual Property Security Agreement ...............................................C

August 17, 2007 Intellectual Property Security Agreement ...........................................D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GPS INDUSTRIES, INC., a Nevada corporation, and GPS IT, LLC, a Nevada limited liability company, )<br><br>Plaintiffs, )<br><br>v. )<br><br>PROLINK SOLUTIONS, LLC, a Delaware limited liability company, PROLINK HOLDINGS CORP., a Delaware corporation, LINKSCORP, INC., a Delaware corporation, and ABC NATIONAL TELEVISION SALES, INC., a Delaware corporation )<br><br>Defendants. ) | Civil Action No. <u>FILED: JULY 16, 2008</u><br><u>08CV4028</u><br><br>The Honorable <u>JUDGE KENDALL</u><br><u>MAGISTRATE JUDGE COX</u><br>Magistrate Judge <u>          </u><br><br>PH<br><br>**JURY TRIAL DEMANDED** |

## INDEX OF EXHIBITS

**DESCRIPTION:**                                                                                                          **EXHIBIT NO.**

U.S. Patent No. 5,685,786.....................................................................................................A

U.S. Patent No. 5,438,518......................................................................................................B

June 30, 2006 Intellectual Property Security Agreement ................................................................C

August 17, 2007 Intellectual Property Security Agreement ...........................................................D